# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**Case No.:**

DANIEL HARPER, on behalf of himself
and all others similarly situated,

        Plaintiff,               **CLASS ACTION COMPLAINT**

v.                               **JURY DEMAND**

SHAQUILLE O'NEAL,

        Defendant.

_____ /

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Daniel Harper, on behalf of himself, and all others similarly situated, files this class action complaint against Defendant, Shaquille O'Neal ("O'Neal") for his offer and sale of unregistered securities, including tokens and NFTs in connection with The Astrals Project (defined below).

## PARTIES

1.      Plaintiff Harper is a citizen and resident of the state of Virginia, he is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Harper invested in the Astrals Project and suffered investment losses because of Defendant's conduct.

2.      Defendant O'Neal is a United States citizen and resides in several states, including the state of Florida, where he resides at 10941 Northstar Street, Davie, Florida 33324, and/or where he is amenable to service of process, and is otherwise *sui juris*. O'Neal is a founder of the Astrals Project, exercised control over the Astrals Project, and directed and/or authorized, directly or indirectly, the sale and solicitation of Astrals NFTs to the public.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than Defendant O'Neal. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff, a Virginia citizen, brings his individual claims against O'Neal, a citizen and resident of many states, including Florida, but not Virginia, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

4.     This Court has jurisdiction over O'Neal because he resides in Florida, is doing business in Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida.

5.     For example, in February 2021, O'Neal purchased a seven-bedroom, seven-bath mansion in Davie, Florida, located at 10941 Northstar Street, Fort Lauderdale, Florida 33324, where he resides while conducting business or for pleasure in Florida.

6.     Further, O'Neal, who formerly played for the Miami Heat, is a commentator for TNT's coverage of the National Basketball Association ("NBA"), and regularly comments on basketball games from the Kaseya Center, a multi-purpose arena located along Biscayne Bay in Miami, Florida, which is the home arena for the Miami Heat.

7.     O'Neal otherwise has intentionally availed himself of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiff, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over O'Neal permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under 28 U.S.C. § 1391 because O'Neal conducts substantial business in this District, including commenting on the Miami Heat 2023 playoff games; class members either reside or did business with O'Neal in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because O'Neal

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

received substantial profits from class members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

9.      All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

10.     The ASTRALS Whitepaper describes the Astrals Project as follows:[1]

ASTRALS is a collection of 10,000 metaverse-ready 3D avatars by a world-renowned artist, Damien Guimoneau. These beautiful pieces of art are randomly generated by over 150 handcrafted traits and 16 unique races each with their own immersive lore by grand loremasters, Lee Gingold and Shaman8. There are two pillars to ASTRALS: A) a decentralized autonomous organization (DAO) for incubating innovative projects and B) a story-driven, play-to-earn role-playing game. We are partnered with Solana Labs for the development of our minting website and with MEKKA LAB to build our next-gen staking platform for the distribution of our governance token, $GLXY, as well as the DAO framework for project incubation.

11.     O'Neal not only is a world-famous basketball player, but he is also a renowned investor and businessman. He has substantial investment and entrepreneurial experience, ranging from Shaq's Fun House to Big Chicken, and investments in the now defunct cryptocurrency trading platform, FTX. O'Neal has vast resources to obtain outside advisors and consultants for his various endeavors such that, at all relevant times, O'Neal knew or should have known of potential concerns about regulatory issues concerning the sale of unregistered crypto securities such as those marketed and sold through the Astrals Project. Nevertheless, O'Neal extensively promoted various cryptocurrency projects, including FTX and the Astrals Project, to his 30.4 million followers on Instagram and followers on other social media platforms.

12.     In a broadly disseminated podcast, known as "The FTX Podcast," O'Neal explained the importance of "due diligence,"[2] when making investment decisions. He also explained that his investment philosophy is that when "things that are too good to be true, stay away from it." He further explained the importance of asking questions when making investment decisions: "I like asking questions. If I don't know something, I'll ask."

---

[1] https://melon-lee.gitbook.io/astrals/ (accessed May 23, 2023).
[2] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

13.     With respect to cryptocurrency, O'Neal explained that he initially did not know about cryptocurrency when it first became popular, but educated himself sufficiently to the point that he and his son, Myles O'Neal, subsequently founded their own non-fungible token (NFT) project called "Astrals" (the "Astrals Project").[3]

14.     "NFTs" (non-fungible tokens) are unique cryptographic tokens that exist on a blockchain—the digital database supporting cryptocurrencies—and cannot be replicated. NFTs permit investors to tokenize and secure ownership over a unique digital asset. Analogized to an investment in art, each NFT, like a piece of art, is a unique asset that can be tied to some amount of monetary value, and investors bet on the value of the value of the artist and its work increasing in value over time, such that it can be sold for a profit.

15.     Prior to founding Astrals, O'Neal built his crypto credibility through his involvement with various Ethereum projects, including his own NFT series. Ethereum is a decentralized blockchain platform that establishes a peer-to-peer network that securely executes and verifies application code, called "smart contracts." These smart contracts allow participants to "tokenize" things like art, collectibles, and even real estate. Ownership of an asset is secured by the Ethereum blockchain, meaning that no one can modify the record of ownership, or copy and paste a new NFT into existence.

16.     O'Neal's dominant crypto reputation became apparent when he used an Ethereum-based Creature World NFT as his Twitter profile picture, which resulted in a 1,164% increase in sales volume over a twenty-four-hour period.[4]

---

[3] https://astralsnft.io (accessed May 23, 2023).

[4] https://www.benzinga.com/markets/cryptocurrency/22/02/25883609/shaquille-oneal-switches-from-ethereum-to-solana-in-twitter-name-here-are-the-details (accessed May 23, 2023); https://twitter.com/WuBlockchain/status/1442711572799844352?lang=en (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



17. O'Neal officially switched from the Ethereum platform to the Solana platform, a direct competitor to Ethereum. Like Ethereum, Solana is a decentralized, programmable smart-contract blockchain. However, Solana's core innovation is the Proof-of-History mechanism, which allows for the creation of historical records that prove that an event has occurred as a specific moment in time. By changing his Twitter handle from @SHAQ.ETH to @SHAQ.SOL in February 2022, immediately prior to the March 9, 2022 launch of Astrals, O'Neal became one of the biggest names to publicly endorse a Solana project.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



18.     The Astrals project was O'Neal's brainchild, which he personally developed, along with his music manager, Brian Bayati, as CEO, and his son, Myles O'Neal, as the head of "Investor Relations." Myles' role as head of "Investor Relations" confirms that O'Neal and his team viewed and marketed the Astrals Project from the outset as an investment opportunity. Astrals' webpage[5] links to O'Neal's Twitter handle, which indicates that he is based in Orlando, FL.[6]

19.     According to Chris Tapia, Astrals COO, and Han Lee, Astrals Project Manager:[7]

Shaq was scrolling through Instagram looking for an artist for a DJ Diesel NFT. That's when he found Damien Guimoneau. Damien sculpted Simba, Rafiki and Scar in the latest Lion King movie. He also worked on Doctor Strange in the Multiverse of Madness, Godzilla 2, and Ghost in a Shell, bringing his art into these cinematic universes.

Shaq went into Nick Fury mode and assembled a team, bringing in Brian Bayati, Myles O'Neal, and Chris Tapia to start laying the foundations for what would eventually become ASTRALS. Han Lee, EGGO, and Shaman8 were brought in to assist with technical and creative development. With Damien putting together the art and vision for a 10,000 piece collection, something out of this world was born.

ASTRALS vision is to bridge the gap between Solana and the universe through fun and innovative experiences, such as **ASTRALS: Way of the Soul** (Play-to-Earn

---

[5] https://astralsnft.io/ (last accessed May 23, 2023)

[6] https://twitter.com/SHAQ (last accessed May 23, 2023)

[7] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

strategy game), **Astraland** (metaverse) and the latest addition: **Astrapon**, a gacha game.

20.     In simple terms, the Astral Project aimed to promote investment in a virtual world (the "Astralverse") in which users could socialize, play, and interact with other users, including with O'Neal himself, through unique three-dimensional avatars that could be traded through the "Magic Eden" marketplace. Aside from minting and collecting avatar NFTs through the Astrals ecosystem, investors could purchase them on Magic Eden, the official marketplace for Astrals NFTs.[8]

21.     O'Neal further pushed the investment opportunity through various NFT incentives, such as the "Shaq Signature Pass," which Tapia and Lee describe as:[9]

> The Shaq Signature Pass[10] is an exclusive series of NFTs that can be used to sign your Astral permanently with the signature of the legend himself. **There will only ever be 50 of these in existence**, and they can be earned by participating actively in the community or bidding for them in Magic Eden auctions using $GLXY (all $GLXY used in the auction is added to the treasury). If you're lucky enough to own one of these super limited NFTs, you can head over to our staking site (stake.astralsnft.io) to sign your Astral. Warning: doing so permanently burns the Signature Pass.
>
> **The Shaq Signature Pass is the first consumable NFT of its kind, and the signing technology is one that we think will have wide-ranging applications.** From sports NFTs to celebrity-endorsed NFTs to simply adding badges and frames to existing collections, this sort of technology has the sort of flexibility and scalability that has the potential to be integrated into any NFT project. We are excited to bring this technology to life as we work with our partners and collaborators in the coming months.

22.     Other investment incentives included promotional giveaways. For example, in celebration of the launch of Astrapon, O'Neal gave away three Astrals NFTs to his Twitter followers:[11]

---

[8] https://melon-lee.gitbook.io/astrals/roadmap (accessed May 23, 2023).

[9] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

[10] https://magiceden.io/marketplace/shaquille_oneal_sig_pass (accessed May 23, 2023).

[11] https://twitter.com/SHAQ/status/1563707559600463872 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



**SHAQ** ✔
@SHAQ

In celebration of @Astrals_NFT launching ASTRAPON 🎉

I will be giving away 3 Astrals NFTs

Rules: RT + Like this tweet 🤝

If you're feeling lucky come play with us 👇



9:58 PM · Aug 27, 2022

**1,387** Retweets   **45** Quotes   **1,309** Likes   **4** Bookmarks

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

23.    Astrapon is described as "a Web3 capsule toy machine full of NFTs from popular collections, including Boryoku Dragonz, Communi3, ASTRALS, and more," that the Astrals Project called "a new way to mint and collect NFTs."[12] Players spend $GLXY tokens to "roll the Astrapon" for chances to win NFTs and additional $GLXY.[13] The Astrapon was also apparently a way to induce investors to continue investing in the Astrals Project during the crypto bear market, "as participation is about a tenth of the price of a regular mint, giving each user opportunities to win something cool or to walk away with at least something of value."[14]

24.    Similarly, Astrals investors were given an opportunity to win free tickets to Shaq's Fun House in February 2023 where they could see both O'Neal and his son Myles perform.[15]



---

[12] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).
[13] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).
[14] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).
[15] https://twitter.com/Astrals_NFT/status/1624162665181634560 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

25.     Aside from the giveaways, O'Neal promoted Astrals on social media in various ways, including posts and videos.

26.     For example, during shows performed under his alter ego, DJ Diesel, O'Neal would perform in front of massive backdrops of Astrals avatars. Photographs from those shows were shared on social media:[16]



@Astrals_NFT is in the house!!, good moves @BayatiAstrals



9:12 PM · Jun 22, 2022

4 Retweets    17 Likes

---

[16] https://twitter.com/Jorgetto008/status/1539778454257897473 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

27.   As another example, is a video posted claiming that the Astrals team would not stop until the price of Astrals NFTs reached thirty $SOL, and urging investors to "[h]op on the wave before its [sic] too late."[17]



---

[17] https://twitter.com/BuffbabyG/status/1503633086323601413 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

28.     O'Neal also minted, promoted, and sold his own NFT to serve as his avatar in the Astral ecosystem: [18]



_____

[18] https://twitter.com/SHAQ/status/1484658150691069952?lang=en (accessed May 23, 2023).

29.     Likewise, Astrals promoted O'Neal and his other ventures, tweeting for example a promotion of O'Neal's 2022 EDC Las Vegas performance:[19]





---

[19] https://twitter.com/Astrals_NFT/status/1527749431776292865 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

30.      O'Neal also used the Astrals Project as an additional opportunity to promote and hype the FTX trading platform to his followers, relying in part on the credibility in the crypto world he was generating through the Astrals Project to do so.

31.      Investors in the Astrals Project were personally invited by O'Neal to a members-only Discord - a voice, video, and text chat app used by millions of people to easily communicate while playing computer games together, which O'Neal acknowledged was "where the [Astrals NFT] community begins,"[20] and where he also would promote and post updates about his partnership with FTX:[21]





---

[20] https://twitter.com/SHAQ/status/1501406398173040641 (accessed May 23, 2023).

[21] https://discord.com/channels/928105025392214027/970820276805849118/97258865833712851 9 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

32.     On November 9, 2022, as the FTX platform was failing and in freefall towards its eventual collapse, Chris Tapia, Astrals COO, posted on the Astrals account on Discord from his handle, SEGA, proclaiming that O'Neal was "caught by surprise" and "doesn't know what to make of it all": [22]



33.     On January 2, 2023, O'Neal himself posted on the Astrals account on Discord a GIF image from the movie *The Wolf of Wall Street*, purporting to show his solidarity with his Astral Project followers:[23]

34.     O'Neal has not posted on the Astrals account on Discord since that day, and many question whether he is still involved in the Astrals Project at all.

---

22

https://discord.com/channels/928105025392214027/1000343524576862248/1039798245016223774 (accessed May 23, 2023).

23

https://discord.com/channels/928105025392214027/970820276805849118/105951580904045365 2 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

35.     O'Neal's silence, coupled with the steep drop in Astrals' "floor" price has drawn criticism from many Astrals investors:[24] [25] [26]





36.     Based on his investment and business experience, investment philosophy, and knowledge of cryptocurrency, O'Neal knew or should have known of potential concerns about

---

[24] https://twitter.com/kingfud/status/1659132013105004544 (accessed May 23, 2023).

[25] https://twitter.com/TheGemOracle/status/1659271715225051153 (accessed May 23, 2023).

[26] https://twitter.com/kingfud/status/1659132013105004544/photo/2 (accessed May 23, 2023).

selling unregistered crypto securities, such as the Astrals NFTs, the value of which was linked almost entirely to O'Neal's celebrity status and the success of his promotional efforts.

### f. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

37.     O'Neal's promotions were published on public social media accounts and on podcast platforms, including The FTX Podcast, with national distribution. They were accessible to investors nationwide, including in Florida.

38.     O'Neal specifically targeted Florida residents. As a former star player for the Miami Heat and Orlando Magic, he had a massive fan base in Florida, and planned and promoted events in Florida. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other happenings because he is especially of interest to current and former fans of the Orlando Magic and the Miami Heat.

39.     The Astrals Project specifically targeted Florida residents. In an interview with YouTubers Crypto Warehouse, Astrapon Project Manager, Wangman, explained that Astrals' immediate plan was to display Astrals NFTs in the Solana Spaces in Miami for four months.[27] The Solana Spaces were two Solana-themed retail storefronts, one located in New York City and one in Wynwood, Miami, where NFT newcomers could purchase NFTs.[28] Wangman did not mention the New York Solana Spaces in his interview.

---

[27] https://www.youtube.com/watch?v=L6CaR7mOdeo (accessed May 23, 2023).

[28] https://decrypt.co/121863/solana-spaces-closing-stores-in-nyc-and-miami

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



40.     Further, as part of O'Neal's promotional campaign for FTX, he appears on Episode 114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[29] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

41.     Yver tweeted about the podcast episode from his @yver__ account, which O'Neal then re-tweeted from his @SHAQ account, which indicates that he resides in Orlando, Florida.[30] Yver's tweet—and O'Neals re-tweet—included a one-minute video excerpt of the podcast conversation, which had 54,300 views.

---

[29] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").

[30] https://twitter.com/SHAQ (last accessed May 23, 2023)

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*





42.    O'Neal also promoted the Astrals Project in Miami. On August 29, 2022, he announced in the official Discord, using an emoji of his face, that the Astrals community funded a marketing event at Solana Miami, and "[w]e will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom **and more!**":[31]

---

[31]

https://discord.com/channels/928105025392214027/928185412961308792/10138788637570581
20 (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



===========================

**3. ASTRALS at Solana Spaces Miami**

Astrals are headed to Miami baby! 🧟 The community voted to help fund the marketing event at **Solana Miami!**

- We will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom **and more!**

- Astrals will promote Astrapon and offer attendees a **NEW** way to play! 🎮

- We will be looking for partners to help successfully launch their project utilizing **Hyperdrive.**

===========================

### g.   O'Neal's Vast Contacts with Florida

43.     O'Neal's professional involvement with the State of Florida goes back three decades, beginning with being drafted to the Orlando Magic in 1992. In addition to his four years with the Orlando Magic, O'Neal played for the Miami Heat from 2004 through 2008.

44.     In 2018, O'Neal began hosting "Shaq's Fun House," which describes itself as "Part Music Festival. Part Carnival."[32] The inaugural Fun House was held in Miami in 2018, which included O'Neal himself serving as a D.J. ("DJ Diesel"), alongside others. Shaq's Fun House returned to Miami in 2019 and 2020.

45.     After the 2019 Fun House, O'Neal posted to Instagram, inviting his followers who "missed the most epic miami [sic] music week party of all time" to watch the video online as well.[33]

---

[32] https://shaqsfunhouse.com/ (accessed May 23, 2023).

[33] https://www.instagram.com/p/By_XwXeFyUE/.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



46.     Before the January 2020 Shaq's Fun House in Miami, O'Neal posted a video to Instagram inviting his followers to the Miami event and exhorting them to "See [Him] in Miami."[34]



---

[34] https://www.instagram.com/p/B7TyWemlWyC/.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

47.     Through the present day, O'Neal continues to conduct significant promotional and business activities in Florida.

48.     In February 2020, O'Neal was in Miami for the Super Bowl ("The Big Game") and used this time "when I was in Miami" to post to Instagram to promote insurance sold by The General—one of O'Neal's multiple promotional campaigns.[35]



49.     The next month he remained in Florida and posted to Instagram regarding a music event occurring in Fort Lauderdale, saying, "Ft lauderdale [sic] was crazy last night #Springbreak2020."[36]

---

[35] https://www.instagram.com/p/B8R9GZPFvax/
[36] https://www.instagram.com/p/B9gcb14F2N9/

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



50.     In June 2020, because of the COVID-19 pandemic, O'Neal co-hosted a joint event, "Shaq's Fun House vs. Gronk Beach," which was performed in Orlando, Fla., and broadcast virtually. In 2021, again because of COVID-19 pandemic, O'Neal hosted a livestreamed "Shaq Bowl" from Tampa, instead of a Fun House. He promoted the event on Instagram again.[37]

---

[37] https://www.instagram.com/p/CKl-SsQDWqW/

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



51.     O'Neal also became involved in political activities in South Florida, posting to Instagram a political endorsement for Aramis Ayala, then a candidate for Florida's Tenth Congressional District.[38]

---

[38] https://www.instagram.com/p/CPo2uhwlsi8/.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



52.     In 2021 and 2022, O'Neal promoted the Invicta watch brand from South Florida. On July 16, 2021, O'Neal attended an event at Sawgrass Mills Mall in Sunrise, Florida, to promote his "#SHAQ collection" at the Invicta Store, which he promoted on Instagram on July 14, 2021.[39]

---

[39] https://www.instagram.com/p/CRUuxbdDnY4/

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



53.     Again, on December 2, 2022, O'Neal attended another event at the Sawgrass Mills Mall to promote the Invicta watch brand. He posted about this appearance that same day on Instagram, asking "Whose [sic] ready to meet me at #SawgrassMall in #SouthFlorida TODAY."[40]

---

[40] https://www.instagram.com/p/ClrI_55O-W9/.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



54.     In an event that took place from May 6 through May 7, 2022, O'Neal performed as "DJ Diesel" in Orlando, Florida. O'Neal posted to Instagram on his @djdiesel account to promote the event on January 16, 2022.[41]

---

[41] https://www.instagram.com/p/CYzJMEwJ8gJ/.

27

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



55.     On September 9, 2022, O'Neal performed as "DJ Diesel" in Tallahassee, Fla.[42]

---

[42] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*



*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

56.     On October 31, 2022, O'Neal performed as "DJ Diesel" in Gainesville, Fla.[43]



## A.     The SEC's Consistent Approach to Cryptocurrency.

### Overview

57.     Despite the crypto industry's complaints about a lack of "regulatory clarity," the SEC's stance on cryptocurrency has always been consistent. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing.Clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

---

[43] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

58.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[44]

59.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

"We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

60.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is consistently considered and affirmed, in the same way it has by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[45] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a

---

[44] https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 23, 2023).

[45] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

reasonable expectation of profits to be derived from the efforts of others."[46] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

61.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in digital assets in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[47]

62.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[48] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[49] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[50]

63.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[51]

---

[46] *Id*.

[47] ia_virtualcurrencies.pdf (sec.gov) (accessed May 23, 2023).

[48] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 23, 2023).

[49] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 23, 2023).

[50] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 23, 2023).

[51] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

64.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[52] multiple speeches,[53] Congressional testimony,[54] and several official SEC statements[55] and proclamations.[56] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[57] warning that their failure to register with the SEC may violate U.S. securities laws.[58] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[59]

65.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[60] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[61] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[62]

---

[52] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 23, 2023).

[53] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 23, 2023).

[54] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 23, 2023).

[55] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 23, 2023).

[56] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 23, 2023).

[57] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 23, 2023).

[58] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html (accessed May 23, 2023).

[59] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 23, 2023).

[60] SEC.gov | Kennedy and Crypto (accessed May 23, 2023).

[61] *Id.*

[62] *Id.*

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

66.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[63]

67.     What follows are summaries of three cases that will help inform this litigation.

**SEC v. KIK**

68.     In Kik[64], the SEC's complaint[65], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[66]

69.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

**SEC v. Telegram**

70.     In Telegram,[67] the SEC filed a complaint[68] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

71.     Telegram argued[69] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted

---

[63] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 23, 2023).

[64] https://www.sec.gov/news/press-release/2020-262 (accessed May 23, 2023).

[65] https://www.sec.gov/news/press-release/2019-87 (accessed May 23, 2023).

[66]     https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 23, 2023).

[67] https://www.sec.gov/news/press-release/2020-146 (accessed May 23, 2023).

[68] https://www.sec.gov/news/press-release/2019-212 (accessed May 23, 2023).

[69]     https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

72.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[70] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

73.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### SEC v. BlockFi

74.     In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [71]with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

75.     BlockFi argued for "increased regulatory clarity" but lost.[72]

76.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

---

[70] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 23, 2023).

[71] https://lnkd.in/d-Xy45ec (accessed May 23, 2023).

[72] https://blockfi.com/pioneering-regulatory-clarity (accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

**B.      Astrals NFTs are unregistered securities.**

77.      Under the *Howey* Test, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

78.      Applying the *Howey* Test to the Astrals NFTs reveals they qualify as securities as an investment contract:

      **a.   An investment of money**

         i.   Investors purchasing Astrals NFTs made an investment of money or other valuable consideration for the purposes of the *Howey* Test. As the SEC states in its Framework: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

      **b.   In a common enterprise**

         i.   The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

        ii.   This is true of Astrals NFT investors. Investors who buy Astrals NFTs are passive participants in the enterprise, with the profits of each investor intertwined with the fate of the Astrals Project. The fortunes of the Astrals NFT investors, and the value of the Astrals NFTs, were linked almost entirely to O'Neal's celebrity status and the success of his promotional efforts. Accordingly, investors in Astrals NFTs participated in a common enterprise.

      **c.   With the expectation of profit**

         i.   In terms of "reasonable expectations of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

ii.   In particular, the SEC's Framework identifies several factors to help assess whether the "reasonable expectation of profits" element is met:

1. The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit.

2. The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

   a. The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

   b. This also can be the case where the digital asset gives the holder rights to dividends or distributions.

3. The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

4. Purchasers reasonably would expect that an AP's [Active Participant, or promoter] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

5. The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

iii.   Investors in Astrals NFTs are clearly expecting profit through the appreciation of their digital assets, including through O'Neal's promotion efforts, that could be sold and traded through the "Magic Eden" marketplace.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

**d. To be derived from the efforts of others**

i.  The SEC Framework provides that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on the efforts of an [Active Participant]? Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?

ii.  The SEC Framework continues:

1.  Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

2.  An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

    a.  Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

3.  There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

4. An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

5. An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

6. An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network . . .

iii. Purchasers of Astrals NFTs are entirely reliant on the managerial efforts of the issuers for their potential profits. Indeed, the success of the Astral Project's ability to maintain the Astrals NFTs value depended significantly on O'Neal's celebrity status and promotional activities. This is again unlike an investment in Bitcoin, for example, which is decentralized and run by no one other than the market.

79.     The Astrals NFTs were therefore "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

80.     Plaintiff purchased unregistered securities in the form of Astrals NFTs.

81.     The Astrals webpage notes that "Astrals NFTs will be minted on March 9, 2022 and discord will be open to the public.[73] Astrals advertised that "ASTRALS will be listed on Magic Eden, your [i.e, investors'] official marketplace for ASTRALS NFTS. We will set up a holder's only channel in our open discord. We are planning a secret event as well that will be available for holders to attend." *Id.*

---

[73] https://astralsnft.io/ (last accessed May 23, 2023).

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

82.     Astrals noted that 10,000 Astrals will be in supply, with presale to begin March 9, 2022 and public sale March 10, 2022. *Id.*

83.     Plaintiff purchased the following NFTs from the Astrals Project:

| Astral # out of 10,000 | Purchase Price In Solana | Date Purchased |
|---|---|---|
| 7129 | 3.9 | 3/12/2022 |
| 6954 | 9.5 | 3/21/2022 |
| 14 | 14 | 4/27/2022 |
| 2371 | 13.5 | 5/3/2022 |
| 2385 | 8 | 5/5/2022 |
| 2523 | 12 | 5/6/2022 |
| 7844 | 15 | 5/10/2022 |
| 9487 | 14.8 | 5/11/2022 |
| 8104 | 12 | 5/13/2022 |
| 2469 | 8.73 | 6/2/2022 |
| 2663 | 11 | 6/2/2022 |
| 4406 | 8.5 | 6/2/2022 |
| 7027 | 10 | 6/4/2022 |
| 5095 | 8 | 6/5/2022 |
| 87 | 9.9 | 6/6/2022 |
| 4485 | 7.7 | 6/11/2022 |
| 8481 | 7.25 | 6/12/2022 |
| 9825 | 8 | 6/16/2022 |
| 3895 | 8.1 | 6/17/2022 |
| 5316 | 7.39 | 6/17/2022 |
| 5565 | 9 | 6/17/2022 |
| 6557 | 10 | 6/17/2022 |
| 3862 | 5.98 | 6/21/2022 |
| 5990 | 6.19 | 6/21/2022 |
| 6111 | 6.45 | 6/21/2022 |
| 8377 | 5.98 | 6/21/2022 |

| | | |
|---|---|---|
| 6085 | 11.89 | 6/27/2022 |
| 5212 | 14 | 7/10/2022 |
| 1765 | 6.5 | 7/12/2022 |
| 3692 | 6.5 | 7/16/2022 |
| 5839 | 7 | 7/20/2022 |
| 9519 | 6.89 | 7/20/2022 |
| 1745 | 8 | 7/21/2022 |
| 2742 | 7.49 | 7/25/2022 |
| 495 | 7.9 | 7/27/2022 |
| 2013 | 6.1 | 7/30/2022 |
| 4381 | 5.5 | 7/31/2022 |
| 5396 | 6.5 | 8/7/2022 |
| 380 | 6 | 8/11/2022 |
| 9482 | 7 | 8/11/2022 |
| 6465 | 5.99 | 8/30/2022 |
| 6765 | 8.55 | 9/11/2022 |
| 3615 | 5.7 | 9/17/2022 |
| 3532 | 6.29 | 9/23/2022 |
| 1038 | 8.7 | 10/18/2022 |
| 7968 | 4.98 | 10/26/2022 |
| 1240 | 7.9 | 11/12/2022 |
| 2444 | 8.5 | 11/12/2022 |
| 3444 | 8 | 11/12/2022 |
| 3704 | 6 | 11/12/2022 |
| 3784 | 7.6 | 11/12/2022 |
| 39 | 6.89 | 11/12/2022 |
| 4187 | 8.25 | 11/12/2022 |
| 4648 | 5.57 | 11/12/2022 |
| 4995 | 5.9 | 11/12/2022 |
| 6966 | 6.9 | 11/12/2022 |

| 1303 | 6.2 | 11/15/2022 |
|------|-----|------------|
| 5193 | 6.55 | 11/16/2022 |
| 146 | 7.89 | 11/18/2022 |
| 1498 | 6.75 | 11/18/2022 |
| 9302 | 6.3 | 11/18/2022 |
| 5983 | 6.12 | 11/29/2022 |
| 6570 | 6.24 | 11/29/2022 |
| 9883 | 8 | 11/29/2022 |
| 331 | 7.65 | 12/3/2022 |
| 6543 | 8 | 12/3/2022 |
| 6532 | 49 | 12/6/2022 |
| 2260 | 6.79 | 12/7/2022 |
| 7246 | 60 | 12/7/2022 |
| 4860 | 10 | 12/11/2022 |
| 6153 | 9.79 | 12/11/2022 |
| 3182 | 7.5 | 1/1/2023 |
| 3774 | 8 | 1/1/2023 |
| 3915 | 8 | 1/1/2023 |
| 564 | 8.2 | 1/1/2023 |
| 5676 | 8 | 1/1/2023 |
| 5957 | 7 | 1/1/2023 |
| 7248 | 6.49 | 1/1/2023 |
| 7463 | 10 | 1/1/2023 |
| 9560 | 7.69 | 1/1/2023 |
| 3889 | 4.1 | 1/3/2023 |
| 3049 | 7.6 | 1/5/2023 |
| 4702 | 55 | 1/8/2023 |
| 2116 | 4 | 1/26/2023 |
| 2622 | 4.1 | 1/26/2023 |
| 4273 | 4.25 | 1/26/2023 |

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

| 5489 | 3.98 | 1/26/2023 |
|---|---|---|
| 5773 | 3.98 | 1/26/2023 |
| 9076 | 4.87 | 1/26/2023 |
| 9126 | 3.7 | 1/29/2023 |
| 3409 | 4.06 | 1/30/2023 |
| 4754 | 4.1 | 1/30/2023 |
| 5301 | 4.2 | 1/30/2023 |
| 5334 | 3.95 | 1/30/2023 |
| 6753 | 4.06 | 1/30/2023 |
| 714 | 4.18 | 1/30/2023 |
| 7242 | 3.98 | 1/30/2023 |
| 816 | 4.11 | 1/30/2023 |
| 7241 | 3.08 | 2/26/2023 |
| 7797 | 4.11 | 2/26/2023 |
| 8965 | 3.22 | 2/26/2023 |
| 9257 | 3.05 | 2/26/2023 |
| 509 | 2.65 | 3/17/2023 |
| 5364 | 8 | 11/12/2022 |
| ShaqPass | 30 | 1/24/2023 |
| ShaqPass | 50 | 12/6/2022 |

84.     As a result, Plaintiff Harper has sustained damages for which O'Neal is liable.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

### CLASS ACTION ALLEGATIONS

85.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.  Class Definitions**

86.     Plaintiff seeks to represent the following Global and Nationwide Classes, and Florida and Virginia Subclasses (collectively, "the Classes"):

> **(1) Global Class:** All persons or entities who, within the applicable limitations period, purchased an NFT from the Astrals Project.
>
> **(2) Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased an NFT from the Astrals Project.
>
> **(3) Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased an NFT from the Astrals Project.
>
> **(4) Virginia Subclass:** All persons or entities in the commonwealth of Virginia who, within the applicable limitations period, purchased an NFT from the Astrals Project.

Excluded from the Classes are the Defendant, and his officers, directors, affiliates, legal representatives, and employees; the Astrals Project, and any of its officers, directors, affiliates, legal representatives, and employees; any governmental entities; any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

**B.  Numerosity**

87.     The Classes are comprised of thousands of consumers globally, nationwide, and throughout the state of Florida who were offered and/or sold Astrals NFTs. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiff, but is easily identifiable through the Astrals Project's corporate records.

### C. **Commonality/Predominance**

88.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

    (a) whether Defendant violated the Securities Act;

    (b) whether Astrals NFTs constitute securities under federal law;

    (a) whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

    (b) whether Plaintiff and Class members are entitled to injunctive relief;

    (c) whether Plaintiff and Class members are entitled to declaratory relief; and

    (d) whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendant's conduct.

### D. **Typicality**

89.     Plaintiff's claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiff and all class members were offered and/or unregistered securities, and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to Defendant that are unique to Plaintiff.

### E. **Adequacy of Representation**

90.     Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F. **Requirements of Fed. R. Civ. P. 23(b)(3)**

91.     The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct of the offer and sale of unregistered securities in the form of Astrals NFTs.

92. Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

93. As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G. **Superiority**

94. A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

### H. **Requirements of Fed. R. Civ. P. 23(b)(2)**

95. Defendant has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of offering and/or selling the Astrals NFTs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### I. **Requirements of Fed. R. Civ. P. 23(c)(4)**

96. Because the predominant issue regarding Defendant's liability is whether the Astrals NFTs offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

either or both of the Classes against Defendant for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J.   Nature of Notice to the Proposed Classes.

97.     The names and addresses of all Class Members are contained in the business records maintained by the Astrals Project and are readily available to Defendant. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

### COUNT ONE
### Offer and Sale of Unregistered Securities
### in Violation of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a)
### (on behalf of Plaintiff and Members of the Classes)

98.     Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows.

99.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

100.    Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), states:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

101.    The Astrals NFTs are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) because are "notes" and/or "investment contracts."

102.    The Astrals NFTs were not registered with the SEC. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

103.    Defendant made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

104.     Defendant sold and offered to sell the unregistered Astrals NFTs to Plaintiff and Nationwide Class members, in violation of 15 U.S.C. §§ 77e(a).

105.     Plaintiff and members of the Nationwide Class suffered damages as a result of their purchase of the unregistered Astrals NFTs securities through the Magic Eden marketplace.

106.     By reason of the foregoing, Defendant violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

107.     As a result of Defendant's unregistered sale of the Astrals NFTs securities, Defendant is liable to Plaintiff and the members of the Nationwide Class. 15 U.S.C. § 77l(a).

## COUNT TWO

### Violation of Section 15 of the Securities Act

### (on behalf of Plaintiff and Members of the Classes)

108.     Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows .

109.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

110.     This Count is asserted against Defendant under Section 15 of the Securities Act, 15 U.S.C. §77o.

111.     Defendant, by virtue of his office, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, and as set forth herein, a controlling person within the meaning of Section 15 of the Securities Act. Defendant had the power and influence and exercised the same to cause the unlawful offer and sale of Astral securities as described herein.

112.     Defendant possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the Astrals Project through ownership of voting securities, by contract, subscription agreement, or otherwise.

113.     Defendant had sufficient influence to have caused the Astrals Project to submit a registration statement.

114.     Defendant jointly participated in, and/or aided and abetted, the Astrals Project's failure to register the Astral Securities.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

115.    Defendant knew of or had reasonable grounds to believe in the existence of the facts underlying Defendant's and the Astrals Project's liability for violating Section 12(a) of the Securities Act, 15 U.S.C. §77l(a).

116.    By virtue of the conduct alleged herein, Defendant is liable for the wrongful conduct complained of herein and is liable to Plaintiff and the Classes for rescission and/or damages suffered.

### COUNT THREE
**Offer and Sale of Unregistered Securities**
**in Violation of Florida Statute Section 517.07,**
**The Florida Securities and Investor Protection Act**
**(on behalf of Plaintiff and Members of the Florida Subclass)**

117.    Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows.

118.    Plaintiff brings this claim individually and on behalf of the members of the Florida Subclass against Defendant.

119.    The Florida Securities and Investor Protection Act ("FSIPA"), Section 517.07(1) *et seq.*,, provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

120.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

121.    The Astrals NFTs are securities pursuant to Fla. Stat. § 517.021(22)(a).

122.    The Astrals NFTs sold and offered for sale to Plaintiff and members of the Florida Subclass were not:

a.      exempt from registration under Fla. Stat. § 517.051;

b.      a federal covered security;

c.      registered with the Office of Financial Regulations (OFR); or

d.      sold in a transaction exempt under Fla. Stat. § 517.061.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

123.     The Astrals Project sold and offered to sell the unregistered Astrals NFTs to Plaintiff and the members of the Class.

124.     Defendant is a "director, officer, partner, or agent of or for the seller," of the Astrals Project pursuant to § 517.211, tasked with acting on behalf of the Astrals Project within the state of Florida and beyond to broadly solicit potential investors to purchase Astrals NFTs from the Astrals Project. The Astrals Project held out Defendant as possessing sufficient authority to sell securities when, it publicly collaborated or partnered with Defendant, for instance, in a way that sanctioned Defendant to discuss selling Astrals NFTs investments and related crypto assets. The average and reasonable person looking at these collaborations and brand partnerships would reasonably believe that the Astrals Project held out Defendant as possessing sufficient authority to sell securities.

125.     The Astrals Project, with Defendant's material assistance, offered and sold the unregistered Astrals NFTs to Plaintiffs and the members of the Class. As a result of this assistance, Defendant violated FSIPA section 517.07 *et seq*.

## COUNT FOUR
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq*.**
**(on behalf of Plaintiff and Members of the Florida Subclass)**

126.     Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows.

127.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

128.     Plaintiff and Class members are consumers as defined by section 501.203, Fla. Stat. Plaintiffs and Class members are consumers—i.e., individuals—as defined by section 501.203. Defendant is engaged in trade or commerce within the meaning of the FDUTPA, and other state statutes, in that he is engaged in advertising, soliciting, providing, offering, or distributing, whether by sale or otherwise, a good or service, or any property whether tangible or intangible.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

129.   Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

130.   Defendant's unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

131.   Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

132.   Plaintiff and consumers in the Florida Subclass have been aggrieved by Defendant's unfair and deceptive practices and acts of false advertising by purchasing Astrals NFTs, having parted with money under false pretenses.

133.   The harm suffered by Plaintiffs and consumers in the Florida Subclass was directly and proximately caused by the deceptive and unfair practices of Defendant, as more fully described herein.

134.   Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

135.   Defendant still utilizes many of the deceptive acts and practices described above. Plaintiff and the other members of the Florida Subclass have suffered and will continue to suffer irreparable harm if Defendant continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff and the Florida Subclass to obtain both declaratory or injunctive relief to put an end to Defendant's unfair and deceptive scheme.

### COUNT FIVE
**Violations of the Virginia Securities Act**
**Code of Virginia §§ 13.1–501 *et seq*.**
**(Plaintiff individually and on behalf of the Virginia Subclass)**

136.   Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows.

137.   Section 13.1-507 of the Virginia Securities Act ("VSA") provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

138.    The Astrals NFTs are securities pursuant to Section 13.1-501, as more fully described herein.

139.    The Astrals NFTs offered for sale to Plaintiffs and the Virginia Subclass members have not been registered, and are not exempt from registration.

140.    Defendant assisted in and actively participated in Defendant's offer and sale of the unregistered Astrals NFTs to Plaintiff and the members of the Virginia Subclass, as more fully described herein.

141.    As a result of these actions, Defendant violated sections 13.1-501 of the VSA.

<u>COUNT SIX</u>
**Violations of the Virginia Consumer Protective Act**
**Code of Virginia §§ 59.1-196 *et seq*.**
**(Plaintiff individually and on behalf of the Virginia Subclass)**

142.    Plaintiff re-alleges and incorporates paragraphs 1–96 above as if fully set forth herein and further alleges as follows.

143.    This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

144.    Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

145.    Defendant is a "supplier(s)" and engaged in "consumer transaction(s)" as defined by the Act and as described herein. Defendant engaged in, among other things, the advertisement, sale, or offering for sale of goods or services to be used primarily for personal purposes.

146.    Defendant has violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

147.    Plaintiff and consumers in the Virginia Subclass have been aggrieved by Defendant's unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments as more fully described herein.

148.    The harm suffered by Plaintiff and consumers in the Virginia Subclass was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendant as more fully described herein.

149.    Pursuant to section 59.1-204, Plaintiff and consumers in the Virginia Subclass make claims for actual damages, attorneys' fees, and costs.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment on behalf of himself and the Classes:

    a.   Certifying the Classes as requested herein;

    b.   Awarding actual, direct and compensatory damages;

    c.   Awarding restitution and disgorgement of revenues if warranted;

    d.   Awarding declaratory relief as permitted by law or equity, including declaring the Defendant's practices as set forth herein to be unlawful;

    e.   Awarding injunctive relief as permitted by law or equity, including enjoining the Defendant from continuing those unlawful practices as set forth herein, and directing the Defendant, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.   Awarding statutory and multiple damages, as appropriate;

    g.   Awarding attorneys' fees and costs; and

    **h.**   Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Harper v. O'Neal*
*Class Action Complaint and Demand for Jury Trial*

Dated: May 23, 2023                    Respectfully submitted,

**By: */s/ Adam Moskowitz*_____**
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
**THE MOSKOWITZ LAW FIRM, PLLC**
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com

**By: */s/Jose M. Ferrer***
Jose Ferrer
Florida Bar No. 173746
Michelle Genet Bernstein
Florida Bar No. 1030736
**MARK MIGDAL HAYDEN LLP**
80 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
michelle@markmigdal.com

*Co-Counsel for Plaintiff and the Class*