## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.: 1:23-cv-21912-FAM

DANIEL HARPER, et al., on behalf of themselves
and all others similarly situated,

        Plaintiffs,

v.

SHAQUILLE O'NEAL, et al.,

        Defendants.

**AMENDED CLASS ACTION
COMPLAINT**

---

### AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Court appointed Lead Plaintiffs: Daniel Harper, Daniel Koch, Shaun Divecha, Viraf Sam Chapgar, Mickey Scott, and Timo Walter (collectively, "The Harper Group"), through their chosen Class Counsel, and in accordance with the Court's August 22, 2023 Order, [ECF No. 23], on behalf of themselves and all others similarly situated, file this Amended Class Action Complaint against Defendants, Astrals LLC, Astrals Holding, LLC, and Astrals Operations LLC (collectively, the "Astrals Entities"), and Shaquille O'Neal ("O'Neal"), for their various securities violations, including the offer and sale of unregistered securities, such as the Galaxy tokens and NFTs[1] created for the Astrals Project. The main promoter of the Astrals Entities was basketball phenom and superstar: Defendant Shaquille O'Neal.

---

[1] NFTs (non-fungible tokens) are unique cryptographic tokens that exist on a blockchain and cannot be replicated. NFTs can represent digital or real-world items like artwork and real estate. *See* https://www.investopedia.com/non-fungible-tokens-nft-5115211 (accessed July 24, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



**Jorgetto** 🌙 🟠
@Jorgetto008                                                    ···

@Astrals_NFT is in the house!!, good moves @BayatiAstrals



9:12 PM · Jun 22, 2022

**4** Retweets   **17** Likes

1.      At the exact same time the billion-dollar FTX crypto fraud was being uncovered and collapsing, and Mr. O'Neal was attempting to distance himself from his FTX promotions (literally running and hiding from process servers), he was also trying to distance himself from the Astrals Entities, where he was admittedly one of the ***founders, main promoters***, ***main stars*** and even decided to have his son serve as head of "Investor Relations," so his whole family could greatly profit from The Astrals Project.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

2.      Ironically, right before O'Neal decided to run for the hills and abandon his Astrals Project, he posted a meme on the Astrals Discord,[2] a .gif of a scene from the movie *The Wolf of Wall Street*, assuring all of the Astral Investors that "I'M NOT F***ING LEAVING," implying that he would always be there for his Astrals Investors.



But O'Neal has not been seen at Astrals since this now legendary *Wolf of Wall Street* post.

3.      These allegations are supported by the testimony of Professor Lee Reiners, one of the country's foremost crypto experts. Professor Reiners is the "Lecturing Fellow" at Duke University and at Duke Law School, and a member of the CFA Institute Capital Markets Policy Council. Professor Reiners attaches to this Amended Complaint his Expert Report, and analysis of the Astrals Financial Products and explains why they constitute securities under applicable securities law. A copy of Mr. Reiners' report is attached to this Complaint as **Exhibit A** and is fully incorporated by reference herein (the "Reiners Report").

4.      The Harper Group, on behalf of themselves and a putative global class of investors who purchased Astrals NFTs ("NFTs") and/or Galaxy ("GLXY") tokens (collectively, the "Astrals Financial Products") from the Astrals Project[3] since they launched on March 9, 2022.

---

[2] Discord is a voice, video, and text chat app used by tens of millions of people ages 13+ to talk and hang out with their communities and friends. *See* https://discord.com/safety/360044149331-what-is-discord (accessed July 24, 2023).

[3] *See* https://astralsnft.io (accessed July 24, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

5.     The ASTRALS own Whitepaper describes the "Astrals Project" as follows:[4]

ASTRALS is a collection of 10,000 metaverse-ready 3D avatars by a world-renowned artist, Damien Guimoneau. These beautiful pieces of art are randomly generated by over 150 handcrafted traits and 16 unique races each with their own immersive lore by grand loremasters, Lee Gingold and Shaman8. There are two pillars to ASTRALS: A) a decentralized autonomous organization (DAO) for incubating innovative projects and B) a story-driven, play-to-earn role-playing game. We are partnered with Solana Labs for the development of our minting website and with MEKKA LAB to build our next-gen staking platform for the distribution of our governance token, $GLXY, as well as the DAO framework for project incubation.

6.     The Astrals Project is a Solana[5]-based NFT collection of 10,000 3D avatars drawn by a world-renowned, former-Disney artist, which aimed to promote investment in a virtual world (the "Astralverse") in which users could socialize, play, and interact with other users, including specifically with O'Neal himself.

7.     The Astrals Project launched on March 9, 2022, and was the brainchild of O'Neal, who personally developed the Astrals Project with his music manager, Brian Bayati, as CEO, and son, Myles O'Neal, as the Head of Investor Relations. *Id.* According to an Ask Me Anything ("AMA") with Astrals Project Manager, Han Hyung Lee, O'Neal was originally skeptical of NFTs and thought they were a scam, but eventually came around to create the Astrals Project after previously becoming involved in several other NFT and cryptocurrency projects, including the now defunct FTX Platform, which collapsed and went into Chapter 11 bankruptcy on November 11, 2022. *Id.*

8.     The value of the Astrals Financial Products was linked almost entirely to O'Neal's celebrity status and many Astrals investors, including The Harper Group, were induced to purchase Astrals Financial Products from the Astrals Project because of O'Neal's direct, open, and heavy involvement in the project. *Id.* He acted as the face of Astrals, pushing the investment opportunity to his massive social media following on Twitter and through his "DJ Diesel" shows, often performing in front of a massive backdrop of Astrals characters. *Id.*

9.     O'Neal even personally invited Astrals Project investors to a members-only Discord channel and created investment incentives, such as the limited mint NFT "ShaqPass" and

---

[4] https://melon-lee.gitbook.io/astrals/ (accessed May 23, 2023).

[5] Solana is a blockchain platform designed to host decentralized, scalable applications. *See* https://www.investopedia.com/solana-5210472 (accessed July 24, 2023).

multiple giveaways. *Id*. O'Neal posted daily on the Astrals' Discord channel , reassuring investors that the project would only grow, with the goal of becoming a household name. *Id*. Other members of the Astrals team similarly assured Astrals community members that O'Neal was not only a vital asset, using his celebrity status and vast network to help develop the project, but was also in for the long haul, not just a cash grab. *Id*.

10.     Like most Astrals investors, The Harper Group followed O'Neal on Twitter and learned about the Astrals Project through his many endorsements. After their initial purchases, The Harper Group remained involved in the Astrals community, where they first met each other, and held their Astrals Financial Products based on representations O'Neal and the rest of the Astrals team made. For example, The Harper Group actively participated in the Astrals' Discord channel where O'Neal spoke directly to the community about his support of and plans for the project, such as achieving a floor price of 30 SOL.[6] Similarly, The Harper Group communicated with Astrals' team members, such as Lee, via private messages and exclusive AMAs which were only available to Astrals investors.

11.     When the FTX cryptocurrency trading platform collapsed in November 2022, many Astrals community members were concerned about the future of the project, especially because O'Neal had close ties to FTX, but were reassured by team members that the project would continue as planned with O'Neal's close involvement. However, Defendant O'Neal decided to flee the project and the value of the Astrals Financial Products plummeted.

## PARTIES

12.     Lead Plaintiff Daniel Harper is a citizen and resident of the state of Virginia,  a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No. 15-1, Ex. 1], Plaintiff Harper invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

13.     Plaintiff Daniel Koch is a citizen and resident of Germany, a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No.

---

[6] 1 SOL was worth approximately $90.00 USD when Astrals launched on March 9, 2022. *See* https://finance.yahoo.com/quote/SOL-USD/history?period1=1646784000&period2=1646870400&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true (accessed July 24, 2023).

15-1, Ex. 2], Plaintiff Koch invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

14.     Plaintiff Shaun Divecha is a citizen and resident of Canada, a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No. 15-1, Ex. 3], Plaintiff Divecha invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

15.     Plaintiff Viraf Sam Chapgar is a citizen and resident of Canada, a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No. 15-1, Ex. 4], Plaintiff Chapgar invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

16.     Plaintiff Micky Scott is a citizen and resident of the state of Iowa, a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No. 15-1, Ex. 5], Plaintiff Scott invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

17.     Plaintiff Timo Walter is a citizen and resident of Germany, a natural person over the age of 21, and otherwise *sui juris*. As set forth in the previously filed certification, [ECF No. 15-1, Ex. 6], Plaintiff Walter invested in Astrals Financial Products during the Class Period and suffered investment losses as a result of Defendants' conduct.

18.     Defendant O'Neal is a United States citizen and resides in several states, including the state of Florida, where he resides at 10941 Northstar Street, Davie, Florida 33324, and/or where he is amenable to service of process, and is otherwise *sui juris*. O'Neal is a founder of the Astrals Project, exercised control over the Astrals Project, and directed and/or authorized, directly or indirectly, the sale and solicitation of Astrals Financial Products to the public.

19.     Defendants The Astrals Entities each are limited liability companies organized and headquartered in the state of Nevada and are amenable to service of process at 721 Catalina Aisle Street, Las Vegas, Nevada, 89138. Defendants The Astral Entities are the entities organized to operate the Astrals Project and offered and sold the Astrals Financial Products to the public.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than Defendant O'Neal. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiffs, citizens of Virginia, Iowa, Canada, and Germany, bring individual claims against Defendants, citizen and resident of many states, including Florida, but not Virginia, Iowa, Canada, or Germany, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

21.     This Court has jurisdiction over Defendants because they reside in Florida, are doing business in Florida, or do sufficient business in Florida, and have sufficient minimum contacts with Florida.

22.     For example, in February 2021, O'Neal purchased a seven-bedroom, seven-bath mansion in Davie, Florida, located at 10941 Northstar Street, Fort Lauderdale, Florida 33324, where he resides while conducting business or for pleasure in Florida.

23.     Further, O'Neal, who formerly played for the Miami Heat, is a commentator for TNT's coverage of the National Basketball Association ("NBA"), and regularly comments on basketball games from the Kaseya Center, a multi-purpose arena located along Biscayne Bay in Miami, Florida, which is the home arena for the Miami Heat.

24.     Defendants otherwise have intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of unregistered securities to consumers in Florida, including to those similarly situated to Plaintiffs, which constitutes committing a tortious act within the state of Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants conduct substantial business in this District, including commenting on the Miami Heat 2023 playoff games and promoting the Astrals Project within the state of Florida; class members either reside or did

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

business with Defendants in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants received substantial profits from class members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

26.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

27.     O'Neal is not only a world-famous basketball player, he is also a renowned investor and businessman. He has substantial investment and entrepreneurial experience, ranging from Shaq's Fun House to Big Chicken, and investments in the now defunct cryptocurrency trading platform, FTX. O'Neal has vast resources to obtain outside advisors and consultants for his various endeavors such that, at all relevant times, O'Neal knew or should have known of potential concerns about regulatory issues concerning the sale of unregistered crypto securities such as those marketed and sold through the Astrals Project. Nevertheless, O'Neal extensively promoted various cryptocurrency projects, including FTX and the Astrals Project, to his 30.4 million followers on Instagram and followers on other social media platforms.

28.     In a broadly disseminated podcast, known as "The FTX Podcast," O'Neal explained the importance of "due diligence,"[7] when making investment decisions. He also explained that his investment philosophy is that when "things that are too good to be true, stay away from it." He further explained the importance of asking questions when making investment decisions: "I like asking questions. If I don't know something, I'll ask."

29.     With respect to cryptocurrency, O'Neal explained that he initially did not know about cryptocurrency when it first became popular, but educated himself sufficiently to the point that he and his son, Myles O'Neal, subsequently founded their own non-fungible token (NFT) project called "Astrals."[8]

30.     "NFTs" (non-fungible tokens) are unique cryptographic tokens that exist on a blockchain—the digital database supporting cryptocurrencies—and cannot be replicated. NFTs permit investors to tokenize and secure ownership over a unique digital asset. Analogized to an

---

[7] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 (accessed July 24, 2023).

[8] https://astralsnft.io (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

investment in art, each NFT, like a piece of art, is a unique asset that can be tied to some amount of monetary value, and investors bet on the value of the value of the artist and its work increasing in value over time, such that it can be sold for a profit.

31.    Prior to founding Astrals, O'Neal built his crypto credibility through his involvement with various Ethereum projects, including his own NFT series. Ethereum is a decentralized blockchain platform that establishes a peer-to-peer network that securely executes and verifies application code, called "smart contracts." These smart contracts allow participants to "tokenize" things like art, collectibles, and even real estate. Ownership of an asset is secured by the Ethereum blockchain, meaning that no one can modify the record of ownership, or copy and paste a new NFT into existence.

32.    O'Neal's dominant crypto reputation became apparent when he used an Ethereum-based Creature World NFT as his Twitter profile picture, which resulted in a 1,164% increase in sales volume over a twenty-four-hour period.[9]



---

[9]    https://www.benzinga.com/markets/cryptocurrency/22/02/25883609/shaquille-oneal-switches-from-ethereum-to-solana-in-twitter-name-here-are-the-details; https://twitter.com/WuBlockchain/status/1442711572799844352?lang=en.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

33.     O'Neal officially switched from the Ethereum platform to the Solana platform, a direct competitor to Ethereum. Like Ethereum, Solana is a decentralized, programmable smart-contract blockchain. However, Solana's core innovation is the Proof-of-History mechanism, which allows for the creation of historical records that prove that an event has occurred at a specific moment in time. By changing his Twitter handle from @SHAQ.ETH to @SHAQ.SOL in February 2022, immediately prior to the March 9, 2022 launch of Astrals, O'Neal became one of the biggest names to publicly endorse a Solana project.



34.     The Astrals project was O'Neal's brainchild, which he personally developed, along with his music manager, Brian Bayati, as CEO, and his son, Myles O'Neal, as the head of "Investor Relations." Myles' role as head of "Investor Relations" confirms that O'Neal and his team viewed and marketed the Astrals Project from the outset as an investment opportunity. Astrals' webpage[10] links to O'Neal's Twitter handle, which indicates that he is based in Orlando, FL.[11]

35.     According to Chris Tapia, Astrals COO, and Han Lee, Astrals Project Manager:[12]

Shaq was scrolling through Instagram looking for an artist for a DJ Diesel NFT. That's when he found Damien Guimoneau. Damien sculpted Simba, Rafiki and Scar in the latest Lion King movie. He also worked on Doctor Strange in the

---

[10] https://astralsnft.io/ (last accessed May 23, 2023)

[11] https://twitter.com/SHAQ (last accessed May 23, 2023)

[12] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

Multiverse of Madness, Godzilla 2, and Ghost in a Shell, bringing his art into these cinematic universes.

Shaq went into Nick Fury mode and assembled a team, bringing in Brian Bayati, Myles O'Neal, and Chris Tapia to start laying the foundations for what would eventually become ASTRALS. Han Lee, EGGO, and Shaman8 were brought in to assist with technical and creative development. With Damien putting together the art and vision for a 10,000 piece collection, something out of this world was born.

ASTRALS vision is to bridge the gap between Solana and the universe through fun and innovative experiences, such as **ASTRALS: Way of the Soul** (Play-to-Earn strategy game), **Astraland** (metaverse) and the latest addition: **Astrapon**, a gacha game.

36.     In simple terms, the Astral Project aimed to promote investment in a virtual world (the "Astralverse") in which users could socialize, play, and interact with other users, including with O'Neal himself, through unique three-dimensional avatars that could be traded through the "Magic Eden" marketplace. Aside from minting and collecting avatar NFTs through the Astrals ecosystem, investors could purchase them on Magic Eden, the official marketplace for Astrals Financial Products .[13]

37.     O'Neal further pushed the investment opportunity through various NFT incentives, such as the "Shaq Signature Pass," which Tapia and Lee describe as:[14]

The Shaq Signature Pass[15] is an exclusive series of NFTs that can be used to sign your Astral permanently with the signature of the legend himself. **There will only ever be 50 of these in existence**, and they can be earned by participating actively in the community or bidding for them in Magic Eden auctions using $GLXY (all $GLXY used in the auction is added to the treasury). If you're lucky enough to own one of these super limited NFTs, you can head over to our staking site (stake.astralsnft.io) to sign your Astral. Warning: doing so permanently burns the Signature Pass.

**The Shaq Signature Pass is the first consumable NFT of its kind, and the signing technology is one that we think will have wide-ranging applications.** From sports NFTs to celebrity-endorsed NFTs to simply adding badges and frames to existing collections, this sort of technology has the sort of flexibility and scalability that has the potential to be integrated into any NFT

---

[13] https://melon-lee.gitbook.io/astrals/roadmap (accessed May 23, 2023).

[14] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

[15] https://magiceden.io/marketplace/shaquille_oneal_sig_pass (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

project. We are excited to bring this technology to life as we work with our partners and collaborators in the coming months.

38.     Other investment incentives included promotional giveaways. For example, in celebration of the launch of Astrapon, O'Neal gave away three Astrals NFTs to his Twitter followers:[16]



---

[16] https://twitter.com/SHAQ/status/1563707559600463872 (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

39.     Astrapon is described as "a Web3 capsule toy machine full of NFTs from popular collections, including Boryoku Dragonz, Communi3, ASTRALS, and more," that the Astrals Project called "a new way to mint and collect NFTs."[17] Players spend $GLXY tokens to "roll the Astrapon" for chances to win NFTs and additional $GLXY.[18] The Astrapon was also apparently a way to induce investors to continue investing in the Astrals Project during the crypto bear market, "as participation is about a tenth of the price of a regular mint, giving each user opportunities to win something cool or to walk away with at least something of value."[19]

40.     Similarly, Astrals investors were given an opportunity to win free tickets to Shaq's Fun House in February 2023 where they could see both O'Neal and his son Myles perform.[20]



[17] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

[18] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

[19] https://blog.magiceden.io/gm-gm-with-astrals (accessed May 23, 2023).

[20] https://twitter.com/Astrals_NFT/status/1624162665181634560 (accessed May 23, 2023).

13

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

41.     Aside from the giveaways, O'Neal promoted Astrals on social media in various ways, including posts and videos.

42.     For example, during shows performed under his alter ego, DJ Diesel, O'Neal would perform in front of massive backdrops of Astrals avatars. Photographs from those shows were shared on social media:[21]



Jorgetto 💫 🟠
@Jorgetto008

@Astrals_NFT is in the house!!, good moves @BayatiAstrals



9:12 PM · Jun 22, 2022

**4** Retweets   **17** Likes

---

[21] https://twitter.com/Jorgetto008/status/1539778454257897473 (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

43.     O'Neal also posted a video posted claiming that the Astrals team would not stop until the price of Astrals NFTs reached thirty $SOL and urging investors to "[h]op on the wave before its [sic] too late."[22]



*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

44.     O'Neal also minted, promoted, and sold his own NFT to serve as his avatar in the Astral ecosystem: [23]



---

[23] https://twitter.com/SHAQ/status/1484658150691069952?lang=en (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

45.     Likewise, Astrals promoted O'Neal and his other ventures, tweeting for example a promotion of O'Neal's 2022 EDC Las Vegas performance:[24]





---

[24] https://twitter.com/Astrals_NFT/status/1527749431776292865 (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

46.     O'Neal also used the Astrals Project as an additional opportunity to promote and hype the FTX trading platform to his followers, relying in part on the credibility in the crypto world he was generating through the Astrals Project to do so.

47.     Investors in the Astrals Project were personally invited by O'Neal to a members-only Discord - a voice, video, and text chat app used by millions of people to easily communicate while playing computer games together, which O'Neal acknowledged was "where the [Astrals NFT] community begins,"[25] and where he also would promote and post updates about his partnership with FTX:[26]





<hr />

[25] https://twitter.com/SHAQ/status/1501406398173040641 (accessed May 23, 2023).

[26] https://discord.com/channels/928105025392214027/970820276805849118/97258865833712851 9 (accessed May 23, 2023).

48.     On November 9, 2022, as the FTX platform was failing and in freefall towards its eventual collapse, Chris Tapia, Astrals COO, posted on the Astrals account on Discord from his handle, SEGA, proclaiming that O'Neal was "caught by surprise" and "doesn't know what to make of it all": [27]



49.     On January 2, 2023, O'Neal himself posted on the Astrals account on Discord a GIF image from the movie *The Wolf of Wall Street*, purporting to show his solidarity with his Astral Project followers:[28]

50.     O'Neal has not posted on the Astrals account on Discord since that day, and many now question whether he is still involved in the Astrals Project at all.

---

[27]

https://discord.com/channels/928105025392214027/1000343524576862248/1039798245016223774 (accessed May 23, 2023).

[28]

https://discord.com/channels/928105025392214027/970820276805849118/1059515809040453652 (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

51.     O'Neal's silence, coupled with the steep drop in Astrals' "floor" price, has drawn criticism from many Astrals investors:[29] [30] [31]





**@Astrals_NFT** definitely the one that hurts the most out of that list. Complete lack of accountability from @SHAQ @djdiesel @Bayati_music - left their holders high and dry. So much potential, great art, solid community, huge letdown from the management team.

2:56 PM · May 18, 2023 · **121** Views

52.     Based on his investment and business experience, investment philosophy, and knowledge of cryptocurrency, O'Neal knew or should have known of potential concerns about

---

[29] https://twitter.com/kingfud/status/1659132013105004544 (accessed May 23, 2023).

[30] https://twitter.com/TheGemOracle/status/1659271715225051153 (accessed May 23, 2023).

[31] https://twitter.com/kingfud/status/1659132013105004544/photo/2 (accessed May 23, 2023).

selling unregistered crypto securities, such as the Astrals Financial Products, the value of which was linked almost entirely to O'Neal's celebrity status and the success of his promotional efforts.

**Cypher Capital**

53.     Cypher Capital is a $100 million venture capital firm based out of Dubai that has made more than 100 investments and currently manages upwards of 45 assets.[32] Cypher partnered with Astrals in May 2022.

54.     According to their website, Cypher Capital was founded on the belief that crypto-mining is the future.[33]   The website similarly states that Cypher Capital screens investment opportunities and conducts "[f]ull due diligence including engaging external advisors" prior to making any investments.[34]

55.     The Astrals Entities posted about their new partnership as part of their promotional efforts for their unregistered Astrals Financial Products.[35] In response, MelonApple (Han Lee) tweeted that he was "super bullish" to be partnered with Cypher.[36]



> **ASTRALS** 💫                                                    ...
> @Astrals_NFT
>
> We are proudly partnered with @cypher_capital, a $100 million #VC firm
> that aims to be the leading global partner for projects in the #crypto,
> #blockchain and digital assets community. We believe they are a
> powerful ally for us and the @GlxyDAO to bridge @solana and the
> Universe.
>
> 12:16 AM · May 2, 2022

---

[32] https://cyphercapital.com/about/
[33] *Id.*
[34] *Id.*
[35] https://twitter.com/Astrals_NFT/status/1520980411760857090
[36] *Id.*



56.     The reactions to the announcement from the Astrals community were entirely positive, with followers on Twitter hailing the move.[37]



57.     Cypher still advertises their investment in Astrals on their website and appears to

---

[37] *Id.*

still be partners with Astrals.[38]



**MH Ventures**

58.       MH Ventures is a boutique full service early state Venture Capital firm investing in disruptive technologies of the future.[39] MH Ventures announced its partnership with Astrals on March 30, 2022, shortly after the mint date.



59.       This  announcement  garnered  hugely  positive  reactions  from  the  Astrals community.

---

[38] https://pitchbook.com/profiles/company/527099-41#funding
[39] https://twitter.com/MH_Ventures

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



60.     The first Astrals-related post after the announcement came on May 23, 2022, in which MH Ventures shared a video highlighting the main features of the Astrals Project.[40]



*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

61.     This post drew interesting comments from Astrals fans. Particularly, the top comment calls for Shaq and the Astrals team to continue promoting the project because it was underrated.[41]



62.     On July 7, 2022, MH Ventures shared the Astrals medium.com article.[42] The reactions to this post were largely positive.



63.     On July 27, 2022, Astrals was one of the special guests on MH Venture's third episode of their podcast, *Decoded*.[43] Han Lee spoke on behalf of Astrals.

---

[41] *Id.*
[42] https://twitter.com/MH_Ventures/status/1545073500410585088
[43] https://twitter.com/MH_Ventures/status/1552249703609368576

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

**Defendants' Global Promotions targeted the Florida Forum**

64.     O'Neal's promotions were published on public social media accounts and on podcast platforms, including The FTX Podcast, with national distribution. They were accessible to investors nationwide, including in Florida.

65.     O'Neal specifically targeted Florida residents. As a former star player for the Miami Heat and Orlando Magic, he had a massive fan base in Florida, and planned and promoted events in Florida. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other happenings because he is especially of interest to current and former fans of the Orlando Magic and the Miami Heat.

66.     The Astrals Project specifically targeted Florida residents. In an interview with YouTubers Crypto Warehouse, Astrapon Project Manager, Wangman, explained that Astrals' immediate plan was to display Astrals NFTs in the Solana Spaces in Miami for four months.[44] The Solana Spaces were two Solana-themed retail storefronts, one located in New York City and one in Wynwood, Miami, where NFT newcomers could purchase NFTs.[45] Wangman did not mention the New York Solana Spaces in his interview.



---

[44] https://www.youtube.com/watch?v=L6CaR7mOdeo (accessed May 23, 2023).

[45] https://decrypt.co/121863/solana-spaces-closing-stores-in-nyc-and-miami

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

67.     Further, as part of O'Neal's promotional campaign for FTX, he appears on Episode 114 of "The FTX Podcast," hosted by Tristan Yver, which was released on June 8, 2022.[46] O'Neal recorded the episode with Yver from Miami, Florida, telling Yver on the podcast, "Loosen up brother, loosen up . . . You're in Miami, relax."

68.     Yver tweeted about the podcast episode from his @yver__ account, which O'Neal then re-tweeted from his @SHAQ account, which indicates that he resides in Orlando, Florida.[47] Yver's tweet—and O'Neals re-tweet—included a one-minute video excerpt of the podcast conversation, which had 54,300 views.



_____

[46] https://open.spotify.com/episode/2lq0BHiZb88xNRdZ9wUes4 ("Welcome to episode 114 of the FTX Podcast with special guest Shaquille O'Neal and your host Tristan Yver! Shaquille is a family man, basketball superstar, businessman, TV personality, music artist, crypto project entrepreneur, role model & humanitarian.").

[47] https://twitter.com/SHAQ (last accessed May 23, 2023)

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

69.    O'Neal also promoted the Astrals Project in Miami. On August 29, 2022, he announced in the official Discord, using an emoji of his face, that the Astrals community funded a marketing event at Solana Miami, and "[w]e will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom **and more!**":[48]



> ==========================
>
> **3. ASTRALS at Solana Spaces Miami**
>
> Astrals are headed to Miami baby! 🧍 The community voted to help fund the marketing event at **Solana Miami!**
>
> - We will be in attendance with the likes of Solana Pay, FTX, Ledger, MagicEden, Phantom **and more!**
>
> - Astrals will promote Astrapon and offer attendees a **NEW** way to play!🕹️
>
> - We will be looking for partners to help successfully launch their project utilizing **Hyperdrive.**
>
> ==========================

70.    O'Neal's professional involvement with the State of Florida goes back three decades, beginning when the Orlando Magic drafted O'Neal in 1992. In addition to his four years with the Orlando Magic, O'Neal played for the Miami Heat from 2004 through 2008.

71.    In 2018, O'Neal began hosting "Shaq's Fun House," which describes itself as "Part Music Festival. Part Carnival."[49] The inaugural Fun House was held in Miami in 2018, which included O'Neal himself serving as a D.J. ("DJ Diesel"), alongside others. Shaq's Fun House returned to Miami in 2019 and 2020.

72.    After the 2019 Fun House, O'Neal posted to Instagram, inviting his followers who "missed the most epic miami [sic] music week party of all time" to watch the video online as well.[50]

---

[48] https://discord.com/channels/928105025392214027/928185412961308792/10138788637570581 20 (accessed May 23, 2023).

[49] https://shaqsfunhouse.com/ (accessed May 23, 2023).

[50] https://www.instagram.com/p/By_XwXeFyUE/ (accessed July 24, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



73.     Before the January 2020 Shaq's Fun House in Miami, O'Neal posted a video to Instagram inviting his followers to the Miami event and exhorting them to "See [Him] in Miami."[51]



---

[51] https://www.instagram.com/p/B7TyWemlWyC/.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

74.     Through the present day, O'Neal continues to conduct significant promotional and business activities in Florida.

75.     In February 2020, O'Neal was in Miami for the Super Bowl ("The Big Game") and used this time "when I was in Miami" to post to Instagram to promote insurance sold by The General—one of O'Neal's multiple promotional campaigns.[52]



76.     The next month he remained in Florida and posted to Instagram regarding a music event occurring in Fort Lauderdale, saying, "Ft lauderdale [sic] was crazy last night #Springbreak2020."[53]

---

[52] https://www.instagram.com/p/B8R9GZPFvax/

[53] https://www.instagram.com/p/B9gcb14F2N9/

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



77.     In June 2020, because of the COVID-19 pandemic, O'Neal co-hosted a joint event, "Shaq's Fun House vs. Gronk Beach," which was performed in Orlando, Fla., and broadcast virtually. In 2021, again because of COVID-19 pandemic, O'Neal hosted a livestreamed "Shaq Bowl" from Tampa, instead of a Fun House. He promoted the event on Instagram again.[54]

---

[54] https://www.instagram.com/p/CKl-SsQDWqW/

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



78.    O'Neal also became involved in political activities in South Florida, posting to Instagram a political endorsement for Aramis Ayala, then a candidate for Florida's Tenth Congressional District.[55]

---

[55] https://www.instagram.com/p/CPo2uhwlsi8/.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



79.     In 2021 and 2022, O'Neal promoted the Invicta watch brand from South Florida. On July 16, 2021, O'Neal attended an event at Sawgrass Mills Mall in Sunrise, Florida, to promote his "#SHAQ collection" at the Invicta Store, which he promoted on Instagram on July 14, 2021.[56]

---

[56] https://www.instagram.com/p/CRUuxbdDnY4/

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



80.     Again, on December 2, 2022, O'Neal attended another event at the Sawgrass Mills Mall to promote the Invicta watch brand. He posted about this appearance that same day on Instagram, asking "Whose [sic] ready to meet me at #SawgrassMall in #SouthFlorida TODAY."[57]

---

[57] https://www.instagram.com/p/ClrI_55O-W9/.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



81.     In an event that took place from May 6 through May 7, 2022, O'Neal performed as "DJ Diesel" in Orlando, Florida. O'Neal posted to Instagram on his @djdiesel account to promote the event on January 16, 2022.[58]

---

[58] https://www.instagram.com/p/CYzJMEwJ8gJ/.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



82.     On September 9, 2022, O'Neal performed as "DJ Diesel" in Tallahassee, Fla.[59]

---

[59] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*



83.    On October 31, 2022, O'Neal performed as "DJ Diesel" in Gainesville, Fla.[60]



## THE SEC'S CONSISTENT APPROACH TO CRYPTOCURRENCY
### Overview

84.    Despite the crypto industry's complaints about a lack of "regulatory clarity," the SEC's stance on cryptocurrency has always been consistent. Critics of the SEC's stance toward cryptocurrency overlook an important aspect of U.S. securities law – securities regulation is not meant to be precise but is instead intentionally drafted to be broad and all-encompassing. Clarity is not just uncommon; it is deliberately avoided. This is why the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

---

[60] https://www.iheart.com/content/2022-06-23-shaq-is-djing-in-a-city-near-you-this-summer-see-the-tour-dates/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

85.     Along these lines, in *Reves v. Ernst & Young*, the Supreme Court stated that:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). **In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits**, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' . . . Congress therefore did not attempt precisely to cabin the scope of the Securities Acts . . . Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." (emphasis added)"[61]

86.     Crafted to contemplate not only known securities arrangements at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible to capture new instruments that share the common characteristics of stocks and bonds. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

"We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws."

87.     Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue is consistently considered and affirmed, in the same way it has by hundreds of federal courts across the country since the *Howey* Decision, which the Supreme Court adopted over 75 years ago.[62] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test stipulates that an investment contract exists if there is an "investment of money in a common enterprise with a

---

[61]https://scholar.google.com/scholar_case?case=18068523124125938239&q=Reves+v.+Ernst+%26+Young&hl=en&as_sdt=400006&as_vis=1 (accessed May 23, 2023).

[62] https://supreme.justia.com/cases/federal/us/328/293/ (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

reasonable expectation of profits to be derived from the efforts of others."[63] The *Howey* Test is the principal method used by the SEC to determine if a given cryptocurrency is a security.

88.     The SEC has used multiple distribution channels to share its message and concerns regarding crypto, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in digital assets in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies."[64]

89.     A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[65] In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[66] The SEC applied the *Howey* Test to the DAO tokens and concluded they were securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO tokens, the Commission chose to release the report "to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[67]

90.     In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[68]

---

[63] *Id.*

[64] ia_virtualcurrencies.pdf (sec.gov) (accessed May 23, 2023).

[65] Investor Alert: Bitcoin and Other Virtual Currency-Related Investments | Investor.gov (accessed May 23, 2023).

[66] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed May 23, 2023).

[67] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (accessed May 23, 2023).

[68] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets (accessed May 23, 2023).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

91.     In addition, the SEC has publicized its position on cryptocurrency in countless enforcement actions,[69] multiple speeches,[70] Congressional testimony,[71] and several official SEC statements[72] and proclamations.[73] Current SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[74] warning that their failure to register with the SEC may violate U.S. securities laws.[75] In one interview, Gensler said:

> "The law is clear, it's not about waving a wand. Congress spoke about this in 1934 . . . When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that."[76]

92.     On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[77] Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[78] Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[79]

---

[69] SEC.gov | Crypto Assets and Cyber Enforcement Actions (accessed May 23, 2023).

[70] https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 23, 2023).

[71] https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 23, 2023).

[72] https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 23, 2023).

[73] https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 23, 2023).

[74] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 23, 2023).

[75] https://ca.finance.yahoo.com/news/crypto-platforms-dont-register-with-sec-outside-the-law-gensler-164215740.html (accessed May 23, 2023).

[76] https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec (accessed May 23, 2023).

[77] SEC.gov | Kennedy and Crypto (accessed May 23, 2023).

[78] *Id.*

[79] *Id.*

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

93.     The judicial record supports Chair Gensler's assertions. The SEC has taken over 100 crypto-related enforcement actions and has not lost a single case.[80]

94.     What follows are summaries of three cases that will help inform this litigation.

***SEC v. KIK***

95.     In Kik[81], the SEC's complaint[82], filed in the U.S. District Court for the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. Kik argued that the SEC's lawsuit against it should be considered "void for vagueness."[83]

96.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts (and therefore of securities) and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. The court further found that Kik's private and public token sales were a single integrated offering.

***SEC v. Telegram***

97.     In Telegram,[84] the SEC filed a complaint[85] on October 11, 2019, alleging that the company had raised capital to finance its business by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. The SEC sought to preliminarily enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws.

98.     Telegram argued[86] that the SEC has "engaged in improper 'regulation by enforcement' in this nascent area of the law, failed to provide clear guidance and fair notice of its views as to what conduct constitutes a violation of the federal securities laws, and has now adopted

---

[80] SEC Cryptocurrency Enforcement: 2021 Update (cornerstone.com) (accessed May 23, 2023).

[81] https://www.sec.gov/news/press-release/2020-262 (accessed May 23, 2023).

[82] https://www.sec.gov/news/press-release/2019-87 (accessed May 23, 2023).

[83]     https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/ (accessed May 23, 2023).

[84] https://www.sec.gov/news/press-release/2020-146 (accessed May 23, 2023).

[85] https://www.sec.gov/news/press-release/2019-212 (accessed May 23, 2023).

[86]     https://www.financemagnates.com/cryptocurrency/news/sec-vs-telegram-will-gram-tokens-ever-be-distributed/ (accessed May 23, 2023).

an ad hoc legal position that is contrary to judicial precedent and the publicly expressed views of its own high-ranking officials."

99.     On March 24, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction[87] barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully.

100.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000.00 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. It also ordered Telegram Group Inc. to pay a civil penalty of $18,500,000. For the next three years, Telegram is further required to give notice to the SEC staff before participating in the issuance of any digital assets.

### SEC v. BlockFi

101.     In BlockFi Lending LLC, the first SEC case ever involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi [88]with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

102.     BlockFi argued for "increased regulatory clarity" but lost.[89]

103.     To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.

---

[87] SEC v. Telegram: A Groundbreaking Decision in Cryptocurrency Enforcement? | Insights | Greenberg Traurig LLP (gtlaw.com) (accessed May 23, 2023).

[88] https://lnkd.in/d-Xy45ec (accessed May 23, 2023).

[89] https://blockfi.com/pioneering-regulatory-clarity (accessed May 23, 2023).

**SEC v. Terraform Labs Pte. Ltd.**

104.     In one of the most recent developments in the crypto space, on July 31, 2023, Judge Jed Rakoff in the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. *SEC v. Terraform Labs Pte. Ltd., et al.*, No 1:23-cv-01346-JSR, ECF No. 51 (S.D.N.Y. July 31, 2023).[90]

105.     This is a significant ruling for several reasons.

106.     First, it supports the fact that the Astrals Financial Products are unregistered securities.

107.     Second, Judge Rakoff explicitly rejects a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *SEC v. Ripple Labs, Inc., et al.*, No. 1:20-cv-10832, ECF No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto-assets sold directly by the issuer and on the secondary market.[91]

108.     Third, Judge Jed Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a *Financial Times* article, the "[T]he most respected securities authority in the federal judiciary."[92]

109.     The relevant points of comparison in Judge Rakoff's decision to this Action are his analysis around the Luna token and UST stablecoin, which bear similarities to the Astrals Financial Products.

110.     With respect to the Luna token, Judge Rakoff found that a common enterprise and expectation of profit existed because Terraform labs used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that that these improvements would increase the value of the Luna tokens. This is similar to the GLXY token, which was an exchange token.

---

[90] https://storage.courtlistener.com/recap/gov.uscourts.nysd.594150/gov.uscourts.nysd.594150.51.0_1.pdf (accessed August 6, 2023).

[91] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rVqyLFyEZnz8/v0

[92] https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880

Given GLXY's features, it was clearly designed to go up in value as the Astrals Project grew and became more popular with crypto traders.

111.    The SEC makes a similar allegation with respect to Luna in the Terraform Labs action and Judge Rakoff sides with the SEC. From his decision:

> The SEC's theory for horizontal commonality as to these other coins, however, rests on a different but equally plausible theory. As to the LUNA tokens, for instance, the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves. See Amended Complaint ¶¶ 46-47, 49-51. In other words, by alleging that the defendants "pooled" the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise.[93]

112.    Also, of relevance is Judge Rakoff's conclusion that the algorithmic stablecoin, UST, also met the *Howey* standard for investment contracts. Note that this is the first time the SEC has alleged that a stablecoin is an investment contract, and the SEC's reasons for making this allegation also support the assertion that the Astrals Financial Products are securities.

113.    While UST, like most stablecoins, was supposed to be tied one-for-one to the US dollar, Terraform and Kwon marketed "UST coins as profitable investment opportunities—as opposed to just stable stores of value—in meetings with U.S. investors, investment conferences in major U.S. cities, and on social media platforms."[94]

114.    Then, in 2021, Terraform launched the "Anchor Protocol" which was an "investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated."

115.    Judge Rakoff found that "the fact that most of the UST coins were deposited in the Anchor Protocol independently rendered these tokens investment contracts, indeed investments that were touted as being capable of being able to generate future profits of as much as 20%."[95] Judge Rakoff goes on to say:

---

[93] https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rwwEEo0YbENc/v0 at 36

[94] *Id.* at Page 4

[95] *Id.* at Page 34

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol—in other words, on a pro-rata basis."[96]

116.    This closely resembles the facts surrounding the Astrals Financial Products and Judge Rakoff's finding that UST met the requirements for an investment contract supports the conclusion that the Astrals Financial Products are also unregistered securities.

117.    Judge Rakoff also explicitly rejects a key element of Judge Torres' analysis in the *Ripple* decision, stating:

It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[97]

118.    Judge Rakoff goes on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction."[98]

119.    After noting that "in theory, the tokens, if taken by themselves, might not qualify as investment contracts," Judge Rakoff evaluated—"as the Supreme Court did in *Howey*"— "whether the crypto-assets and the 'full set of contracts, expectations, and understandings centered on the sales and distribution of [these tokens]' amounted to an 'investment contract' under federal securities laws."[99]

120.    Judge Rakoff's rejection of the *Ripple* decision's secondary market distinction and fulsome *Howey* analysis support Plaintiffs' assertion that the Astrals Financial Products are unregistered securities. Purchasers of the Astrals Financial Products did not necessarily know who the seller was. But, as Judge Rakoff explains, knowledge of the seller's identity is not necessary

---

[96] *Id.* at Page 36

[97] *Id.* at 40

[98] *Id.* at 41

[99] *Id.* at 32–33.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

to prove that purchasers expected profits based on the efforts of Defendants, who are the ***issuer*** and/or control persons of these assets, and not simply a platform where the assets traded.

**The Astrals Financial Products are unregistered securities.**

121.   Under the *Howey* Test, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

122.   Applying the *Howey* Test to the Astrals Financial Products reveals they qualify as securities as an investment contract, as set forth in the Reiners Report, which is fully incorporated by reference herein. *See, e.g.,* Reiners Report, Section 5 (analysis that "based on the facts of this case, Astrals NFTs are unregistered investment contracts") & Section 7 (analysis that "the $GLXY Token is an unregistered investment contract"):

> 5. BASED ON THE FACTS OF THIS CASE, ASTRALS NFTS ARE UNREGISTERED INVESTMENT CONTRACTS

> 5.01 My expert opinion that Astrals are unregistered investment contracts is principally based on information provided by Astrals, LLC in the ASTRALS Whitepaper.[100] My conclusion is reinforced by Discord and social media messages made by individuals, including Shaquile O'Neal, that were affiliated with the Astrals project, and which are detailed in the amended complaint (TAC).

> 5.02 A whitepaper is a common document in the cryptocurrency industry. Whitepapers are released by crypto project developers to explain the technology and purpose of the project they are undertaking. Whitepapers are not legal documents; in fact, the Astrals whitepaper begins with the following disclaimer: "THIS WHITEPAPER IS IN v0.1. OUR LAWYERS ARE STILL ENSURING THAT THE CONTENTS IN THIS DOCUMENT ARE COMPLIANT, WHICH MEANS THAT ANYTHING AND EVERYTHING IN THIS DOCUMENT IS SUBJECT TO SIGNIFICANT CHANGES UNTIL v1.0."

> 5.03 Purchasing Astrals required an investment of money, satisfying the first prong of the Howey test. According to the SEC's "Framework for "Investment Contract" Analysis of Digital Assets" (Framework) published in 2019, the investment does not need to come in the form of fiat currency: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired

---

[100] <u>Terms and Conditions - ASTRALS Whitepaper v0.1 (gitbook.io)</u>

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[101] Thus, Plaintiffs' purchase of Astrals with the Solana (SOL) cryptocurrency still represents an investment of money. Numerous courts have also recognized that the use of cryptocurrency to purchase crypto-asset securities represents an investment of money under the *Howey* framework.

5.04   Several defendants in cryptocurrency-related enforcement actions and private lawsuits have argued that an "investment of money" is different from "merely payment of money"—that is, *Howey* requires not just payment of money but an intent to invest that money. Courts have rejected this argument. Judge Analisa Torres of the United States District Court for the Southern District of New York, in her ruling on cross-motions for summary judgment filed by the SEC and Ripple in relation to ongoing litigation that dates back to December 2020, rejected the distinction between an "investment" of money and "payment" of money under the *Howey* framework. Judge Torres noted that "[t]he proper inquiry is whether the Institutional Buyers "provide[d] the capital," Howey, 328 U.S. at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d] cash, *Telegram*, 448 F. Supp. 3d at 368–69."[102]

5.05   In order to satisfy the "common enterprise" aspect of the *Howey* test, federal courts require that there be either "horizontal commonality" or "vertical commonality." *See Revak v. SEC Realty Corp*., 18 F.3d. 81, 87-88 (2d Cir. 1994) (discussing horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" and two variants of vertical commonality, which focus "on the relationship between the promoter and the body of investors"). In footnote 11 in the SEC's Framework, the SEC notes that "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[103]

5.06   Astrals has both 'horizontal commonality' and 'vertical commonality.'

5.07   Horizontal commonality exists where (1) a sharing or pooling of the funds of investors and (2) that "the fortunes of each investor in a pool of investors" are tied to one another and to the "success of the overall venture." See *Revak v. SEC Realty Corp*., 18 F.3d 81, 87 (2d Cir. 1994). Pooling occurs when the funds received by the promoter or issuer through an offering are reinvested into the business.

---

[101] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets
[102] SEC vs Ripple 7-13-23.pdf (uscourts.gov)
[103] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

5.08 The proceeds received by Astrals LLC through the sale of Astrals were reinvested in the business. This fact was acknowledged, or implied, multiple times in the Astrals whitepaper. One particular sentence from the whitepaper demonstrates that proceeds from Astrals sales were pooled and reinvested into the business: "To build the ASTRALS metaverse, initial fundraising will be done through selling our 10,000 ASTRALS NFTs as well as our DAO token, $GLXY, in private sales and a public IDO."[104]

5.09 The whitepaper goes on to detail exactly how the sale proceeds will be used: "Our 10,000 ASTRALS NFTs will be sold at a fixed price of 2 $SOL, of which 30% will be allocated to the ASTRALS' Galaxy Treasury, 30% to our team and 5% to our developers, 30% to the artist, 2.5% to the $SHARD-USDC liquidity pool, and 2.5% to charity (will also be in the Treasury to begin with)." It then states: "This split fairly compensates the team and artist, who are committed to this project for the long-term, while also reflecting that we consider the DAO and Treasury to be just as equal as the contributions that have been made by our team and our artist for the success of the ASTRALS roadmap."

5.10 The re-investment of Astrals sale proceeds back into the business was intended to increase the value of the Astrals sold. The pooling of Astrals sale proceeds, in the words of the Revak Court, "tie[] the fortunes of each investor in a pool of investors to the success of the overall venture." 18 F.3d at 87 (quoting *Hart v. Pulte Homes of Mich. Corp.,* 735 F.2d 1001, 1005 (6th Cir. 1984)). Therefore, the fortunes of each Astrals investor are tied to each other and the success of the overall venture.

5.11 Vertical commonality is also present in Astrals because the Astrals Treasury would receive 25% of the royalties of secondary Astrals sales, "as well as any deals that are brokered by ASTRALS, LLC to license and all any intellectual property that belongs to ASTRALS, LLC for deals that include but are not limited to game development, movie production, and fashion items." Thus, it is clear that if the value of Astrals increased, so to would the fortunes of Astrals LLC.[105]

5.12 As noted by the SEC in their Framework, "the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others." Determining whether this prong of Howey is met requires an

---

[104] Metaverse - ASTRALS Whitepaper v0.1 (gitbook.io)
[105] Treasury - ASTRALS Whitepaper v0.1 (gitbook.io)

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

assessment of the "economic reality"[106] of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."[107]

5.13    The SEC's Framework lists a number of factors that may indicate a reasonable expectation of profit, as well as factors that suggest this expectation can only be fulfilled through the efforts of others. Looking at the facts and circumstances surrounding Astrals, it is indisputable that investors in Astrals were expecting to profit from their purchase and that this profit would be "derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 53 U.S. at 852.

5.14    The whitepaper, public statements, and marketing materials made or created by Astrals LLC and its executives and affiliates led Astrals purchasers, in any objective reality, to expect profits.

5.15    The whitepaper literally states that demand for Astrals will be high: "With the backers that we have, we expect that our project will be among some of the highest sought-after on the market."[108] The whitepaper also gives an explicit expectation for Astrals trading volume of 200,000 SOL.[109] This assertion would reasonably lead prospective Astrals purchasers to expect the price of Astrals NFTs to go up due to high demand and trading volume.

5.16    The whitepaper asserts that there are two pillars to Astrals: A) a decentralized autonomous organization (DAO) for incubating innovative projects and B) a story-driven, play-to-earn role-playing game.

5.17    Astrals were purchased with the cryptocurrency SOL, which runs on the Solana blockchain. The SEC alleges SOL is a security in its lawsuits against Coinbase[110] and Binance[111] for operating an unregistered securities exchange, broker, and clearing agency. The SOL proceeds from the initial Astrals sale went to the "treasury" of a decentralized autonomous organization" (DAO) that according to the Whitepaper, will be used for "incubating innovative projects." The $GLXY token is the so-called "governance token" of the DAO. As I detail below, $GLXY is also an unregistered investment contract. According to the whitepaper, "staking your

---

[106] *Howey*, 328 U.S. at 298. *See also Tcherepnin*, 389 U.S. at 336 ("in searching for the meaning and scope of the word 'security' in the [Acts], form should be disregarded for substance and the emphasis should be on economic reality.")

[107] *Joiner*, 320 U.S. at 352-53.

[108] https://melon-lee.gitbook.io/astrals/who-are-the-astrals/treasury

[109] Id.

[110] Coinbase, Inc. and Coinbase Global, Inc. (sec.gov)

[111] comp-pr2023-101.pdf (sec.gov)

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

Astral NFTs enables you to mine $GLXY, the governance token that will govern the Galaxy Treasury via a decentralized autonomous organization (DAO) platform on our website."[112] The Galaxy DAO, in turn, "will allow the community to invest in innovations, projects, and individuals who can push the boundaries of what blockchain technology is capable of."

5.18 The Galaxy DAO is a quasi-venture capital fund, whereby $GLXY token holders get to vote on which projects they want to fund. If these projects generate a profit, that profit would be distributed back to the DAO and then $GLXY token holders. This arrangement is nearly identical to a different project called THE DAO, whose governance token the SEC found to be an unregistered investment contract in 2017 in the landmark *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017) ("The DAO Report").[113]

5.19 Given the above facts, prospective Astrals holders were led to believe that they could generate profit by staking their Astrals and then participating in the Galaxy DAO. In addition, according to the whitepaper, the more Astrals an investor staked, the more influence they could have in the Galaxy DAO. Stated differently, the more Astrals you staked, the greater your "Reputation Score", and those with higher Reputation Scores were more likely to be voted as DAO community leaders that were the ones who would "endorse a proposal for a proposal to move to the voting stage."

5.20 The other significant aspect that led Astrals holders to expect profit from the efforts of the company and its affiliates is the "play-to-earn" game (the "game"), which is one part of what the company called the "Metaverse." The company planned on utilizing the proceeds from the initial Astrals sales to build the game, which would utilize the Astrals IP controlled by the company. The Whitepaper notes that "ASTRALS holders will be airdropped a free NFT for the play-to-earn game."

5.21 Thus, Astrals holders expected profit from the company's efforts in building out a video game that they would be allowed to play, and once they start playing, they could earn additional rewards based upon their performance. The whitepaper notes that "completing quests [in the game] for the first time will allow you to earn $SHARD."

5.22 Once the company used Astrals sale proceeds to build the game, more people would want to play the game, which would drive up demand, and prices, for Astrals. There was hoped for inertia that would drive the price higher and

---

[112] NFTs - ASTRALS Whitepaper v0.1 (gitbook.io)
[113] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

higher.

5.23 Prospective Astrals holders were also led to expect profit by having the ability to sell their Astrals on the "Magic Eden" marketplace. The whitepaper states that "ASTRALS will be listed on Magic Eden, which is your official marketplace for ASTRALS NFTs." Note that the SEC's Framework states that one characteristic indicative of an expectation of profit is if "the digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future."

5.24 Mr. O'Neal's own statements on social media also led Astrals purchasers to expect profit. In one video, he claimed that the Astrals team would not stop until the price of Astrals NFTs reached thirty $SOL, and urged investors to "[h]op on the wave before its [sic] too late."[114]

5.25 The Astrals whitepaper also explicitly held out the potential for prospective Astrals holders to profit off their NFTs through merchandising agreements: "With this NFT, they can show it off, use it as their pfp, and even merchandise it up to $100,000 through the sale of physical merchandise or using their full ASTRALS NFT in a piece of art that they create."[115] In fact, the whitepaper discusses the potential to "merchandise" Astrals NFTs multiple times: "Other than that, holders can create whatever merchandise they would like up to $100,000 USD and should they approach that number or expect to go beyond it please reach out to the team and we'll discuss a licensing deal for anything beyond that amount."

5.26 Astrals holders could only realize profits from the efforts of Astrals LLC and its executives and affiliates. Before I demonstrate this, we must refute the argument that Astrals are nothing more than "collectible, video-game avatars," that were marketed to gamers and intended to be used in the metaverse.

5.27 This argument ignores the technical reality of NFTs and the economic relationship between Astrals NFTs and the broader Astrals project, as purported to be implemented by Astrals LLC.

5.28 Ownership of Astrals was recorded on the Solana blockchain, which is not operated by Astrals LLC. Astrals LLC misled purchases to believe that they owned a piece of unique digital artwork produced by a famous artist. That is simply not true, or could it ever be so. As noted, "[w]ith NFTs, the thing you've bought does not tend to give you ownership of the underlying item."[116] So it is with Astrals.

---

[114] https://twitter.com/BuffbabyG/status/1503633086323601413 (accessed Sept. 1, 2023).
[115] Terms and Conditions - ASTRALS Whitepaper v0.1 (gitbook.io)
[116] NFTs Don't Work the Way You Might Think They Do | WIRED

5.29 The Terms and Conditions section of the whitepaper states: "The team at ASTRALS, LLC (Nevada, USA) will be the legal entity that represents the ASTRALS' Galaxy DAO in the real world, and it owns the name and Intellectual Property involved in the ASTRALS NFT Project ("ASTRALS"). All rights that are not specifically granted to the users and owners of ASTRALS below are reserved by ASTRALS, LLC. This includes but is not limited to the intellectual property rights surrounding the images, names, logos, 3D layer files, trademarks, the website, the ability to mint 3D or other versions of ASTRALS, the look and feel of the user interface, the smart contract code, or anything else not specifically granted by any following licenses."

5.30 Astrals LLC retained the intellectual property to the digital images associated with the Astrals NFTs sold in primary and secondary markets. The company notes that "[a]ll Astrals will be viewable using our specially made 3D viewer and customizable with NFT weapons, armor, and accessories that can be bought and sold on our marketplace." Therefore, the only way for Astrals NFT purchasers to know the image associated with their blockchain address is through the "3D viewer" built and maintained by Astrals LLC.

5.31 Anyone could go online and view the associated image and make a copy of it for their own viewing pleasure. There have also been countless examples of NFT "owners" who have lost access to their NFT because the server hosting the actual digital artwork is no longer in operation for whatever reason.[117]

5.32 Astrals was a scheme orchestrated and run by Astrals LLC and its affiliates, whose efforts were essential to not just the success of the NFTs, but to whether or not the NFTs existed in the form that purchasers were deceived into thinking. Each Astral would not exist in the form represented by the company and expected by buyers without Astrals maintaining the servers where the underlying images are stored, and the company controls the IP associated with these images.

5.33 Astrals holders were misled to expect profit by participating in the Galaxy DAO. The Whitepaper states that the DAO platform exists "on our website" which implies that the company maintains the DAO and is responsible for running it.

5.34 Astrals developers were also essential to building the play-to-earn video game that would allow Astrals holders to generate a profit. The company planned on utilizing the proceeds from the initial Astrals sales to build the game, which would utilize the Astrals IP controlled by the company. The

---

[117] [What Happens to Digital Art If the Servers That Host It Shut Down (businessinsider.com)](businessinsider.com)

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

Whitepaper notes that "ASTRALS holders will be airdropped a free NFT for the play-to-earn game." Buyers would still be able to play the game by purchasing a game NFT. Thus, Astrals holders expected profit from the company's efforts in building out a video game that they would be allowed to play, and once they started playing, they could earn additional rewards based upon their performance.

5.35 The whitepaper also includes references that would lead prospective Astrals purchasers to believe that the efforts of Astrals LLC and its employees and affiliates would allow them to profit off their Astrals. They include the following:

- ASTRALS, LLC hopes to put out more content and create things in the future that holders can all be proud of and have outlined many of our intentions as such.

- We are partnered with Solana Labs for the development of our DAO and minting website and with MEKKA FROGGO to build our next-gen staking platform for the distribution of our governance token, $GLXY.

- All Astrals will be viewable using our specially made 3D viewer and customizable with NFT weapons, armor, and accessories that can be bought and sold on our marketplace. These features will allow owners to personalize their Astral to their heart's content.

- This funding will help us to create even more amazing art and lore that will become canonical to the ASTRALS brand

- The funding will also help us with the development of a browser-based play-to-earn game that will be playable by Q3/Q4 2022, which will be the first step towards building a triple A game.

- Developing this game allows us to build artistic and lore-based assets that can be used in the eventual creation of a triple A game, so that we can continue to build IP for ASTRALS and create value for the Treasury. **These assets will be used in the game with the intention to modify and reuse them for future game development** (emphasis in the original).

- We will then propose a large-scale operation for the development of a metaverse triple A game that utilizes the ASTRALS IP (art, lore, brand) in return for an allocation of revenue from the sales of the game. Asset sales will be done in stages over the course of the game's development in order to fund production.

5.36 The record demonstrates that the efforts of Astrals LLC and its employees were essential to building the Galaxy DAO and the play-to-earn video game, which were the two principal methods through which Astrals holders could realize a profit. This assessment is independent of the type of blockchain used to "host" the Astrals NFTs and who built, or controlled, that blockchain.

5.37 In his decision to deny Dapper Lab's motion to dismiss, Judge Marrero relied on the fact that Dapper Labs created its own blockchain, called Flow, as

54

evidence that *Howey's* "efforts of others prong is satisfied." This is because NBA Top Shot, and Moments NFTs, were built on top of the Flow blockchain. Thus, according to Judge Marrero, "[t]he interplay among Flow [token], the Flow Blockchain, and Moments is necessary to the totality of the scheme at issue."

5.38  The Astrals defendants may attempt to point to the fact that Astrals NFTs are recorded on the Solana blockchain, which they do not control, as evidence for why this case is sufficiently different from Dapper Labs to render any comparison between the two irrelevant. However, this distinction has no bearing on Astrals status as investment contract.

5.39  Development and maintenance of a private blockchain is not the sole factor in determining whether the "efforts of others" prong is satisfied in cryptocurrency and NFT cases. No court has made this assertion, including Judge Marrero. Rather, Judge Marrero relied upon the "economic realities and technological interplay" between the Flow blockchain, Flow token, and Moments as sufficient proof that Dapper Lab's efforts were essential to Moments' value. Thus, Judge Marrero did not need to thoroughly examine other aspects of Moments' economic realities to find the presence of Dapper Lab's essential managerial efforts, although he does reference some of these efforts.

5.40  As I have detailed above, Astrals LLC made numerous representations, via the whitepaper, to potential Astrals NFTs investors about how the company would build various products and services that would imbue Astrals NFTs with value. Without these essential efforts, Astrals NFTs would be nothing more than an entry on a blockchain, which is simply a distributed database. There is no reason to think that data on a blockchain has any more value than a number entered into an Excel spreadsheet.

5.41  In sum, if Astrals LLC and its employees and affiliates did nothing and ceased working on the project, the value of Astrals would plummet. That is exactly what happened.

. . .

7.  THE $GLXY TOKEN IS AN UNREGISTERED INVESTMENT CONTRACT

7.01  My assessment that the $GLXY token is an unregistered investment contract is based principally on statements made by Astrals LLC in the whitepaper. This assessment is reinforced by the Simple Agreement for Future Tokens (SAFT) contract executed by Brian Bayati as "Managing Member" of Astrals LLC and Shaun Divecha.

7.02 First, just like the Astrals NFTs, an investment of money is made to acquire $GLXY. According to the whitepaper, the Astrals NFTs and $GLXY token were to be sold at the same time: "To build the ASTRALS metaverse, initial fundraising will be done through selling our 10,000 ASTRALS NFTs as well as our DAO token, $GLXY, in private sales and a public IDO."[118]

7.03 The whitepaper provides additional information on the initial sale of $GLXY and how much was expected to be raised:

"In order to build our treasury valuation, we will sell 16% of our total supply of $GLXY tokens (48,000,000) to private investors at a 37.5% discount which will be vested linearly over 18 months after an initial unlock of 3,000,000 tokens at launch. These sales will generate $3,000,000 USD that we will be completely allocating to the treasury ($1.5M) as well as to our $GLXY-USDC liquidity pool ($1.5M)."[119]

7.04 Investors who purchased $GLXY tokens were investing in a common enterprise and reasonably expected to earn profits through that enterprise when they sent funds to the Galaxy DAO's Solana blockchain address in exchange for $GLXY tokens. Per the above excerpt on the initial sale of $GLXY, Astrals LLC retained 84% of the total supply of $GLXY (they sold 16% to private investors). Therefore, there was vertical commonality because the price of $GLXY was directly linked to the fortunes of Astrals LLC and outside holders of $GLXY.

7.05 There was also horizontal commonality, because the whitepaper informed investors that the Galaxy DAO was a for-profit entity whose objective was to fund projects in exchange for a return on investment. Proceeds from the initial $GLXY sale were pooled and available to the Galaxy DAO to fund projects. Depending on the terms of each particular project, $GLXY token holders stood to share in potential profits from the projects. This structure is nearly identical to THE DAO, which was the subject of the SEC's 2017 report of investigation.

7.06 The whitepaper contains multiple statements that would reasonably lead prospective $GLXY investors to believe that their investment would generate a profit.

7.07 The whitepaper states that $GLXY is "the governance token that will govern the Galaxy Treasury via decentralized autonomous organization (DAO) platform on our website."[120] According to the whitepaper, the Galaxy DAO "will allow the community to **invest** in innovations, projects, and individuals

---

[118] https://melon-lee.gitbook.io/astrals/who-are-the-astrals/metaverse
[119] https://melon-lee.gitbook.io/astrals/who-are-the-astrals/initial-funding
[120] https://melon-lee.gitbook.io/astrals/who-are-the-astrals/nfts

who can push the boundaries of what blockchain technology is capable of" (emphasis added).[121] The use of the word "invest" in the previous sentence is evidence that participants in the Galaxy DAO should expect a profit (Merrian-Webster's definition of "invest" is "to commit (money) in order to earn a financial return.")[122] The only way to participate in the Galaxy DAO is by holding $GLXY tokens. Furthermore, the whitepaper states that "[v]otes will be weighed by the amount of $GLXY tokens in the voter's wallet." This implies that the more $GLXY an investor holds, the greater their share of the profits should any of the projects the Galaxy DAO invests in generate a profit.

7.08   $GLXY investors were also led to expect a profit because they would be able to sell their $GLXY on a secondary market. The whitepaper notes that $GLXY will initially be sold "in private sales and a public IDO."[123] IDO stands for "initial dex offering" and it refers to a situation where a project launches a token through a decentralized liquidity exchange. Anyone would then be allowed to buy and sell $GLXY on a decentralized exchange.

7.09   Any secondary sales of Astrals NFTs would generate royalties that would be deposited into the Galaxy DAO's treasury for the benefit of $GLXY token holders. In this way, the entire Astrals ecosystem (the NFTs and $GLXY token) represent a "scheme" under the *Howey* framework. Following *Howey*, an "investment contract" under federal securities law is any "contract, transaction, or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promotor or a third party."

7.10   Despite Astrals LLC's assertion that the $GLXY token is part of a "decentralized" organization, a cursory review of the whitepaper reveals that the efforts of Astrals LLC and its development team are essential to realizing the profit potential of $GLXY.

7.11   The whitepaper states: "The team at ASTRALS, LLC (Nevada, USA) will be the legal entity that represents the ASTRALS' Galaxy DAO in the real world."[124] The whitepaper also indicates that Astrals LLC will retain the rights to the "smart contract code." This code is what makes the Galaxy DAO run, and Astrals LLC's retention of the rights to the code implies that they have the ability to change the code at will, which could influence the price of $GLXY.

---

[121] *Id.*

[122] https://www.merriam-webster.com/dictionary/invest

[123] https://melon-lee.gitbook.io/astrals/who-are-the-astrals/metaverse

[124] https://melon-lee.gitbook.io/astrals/

7.12 In what can only be interpreted as an attempt to shield themselves from legal liability, Astrals LLC, in the whitepaper's terms and conditions section, includes two subsections titled "No Guarantees or Future Promises" and "Not Intended as "Investments." However, under "No Guarantees or Future Promises," Astrals LLC reveal just how essential their efforts are to the entire enterprise: "They [buyers] agree that they are not relying on any future commitments by ASTRALS, LLC beyond the community treasury of 6500 SOL and 1.5 million USDC, a staking platform for token distribution, and an online platform for the DAO (assuming sell out and a successful private funding round) in participating in our NFT launch."[125] Indeed, if Astrals LLC provided none of these functions, Astrals and the $GLXY token would be worthless.

7.13 The whitepaper also notes that the company is working with third parties to build the Galaxy DAO and the staking platform for the distribution of $GLXY tokens: "We are partnered with Solana Labs for the development of our DAO and minting website and with MEKKA FROGGO to build our next-gen staking platform for the distribution of our governance token, $GLXY." These products and services are essential to creating $GLXY and maintaining its value.

7.14 The whitepaper states that the Galaxy DAO exists on the Astrals website, which is a centralized website controlled by Astrals LLC: "Importantly, staking your Astral NFTs enables you to mine $GLXY, the governance token that will govern the Galaxy Treasury via a decentralized autonomous organization (DAO) platform on our website." If Astrals LLC were to shut down its website, the Galaxy DAO would no longer be accessible, and the value of $GLXY tokens would decline to zero, the token's current price.[126]

7.15 The Simple Agreement for Future Tokens (SAFT) contract executed by Brian Bayati as "Managing Member" of Astrals LLC and Shaun Divecha also proves the existence of an investment contract.

7.16 A SAFT is modeled from a Simple Agreement for Future Equity (SAFE) which was launched by the startup accelerator Y Combinator in 2013 and has since become a common way for early-stage companies to raise money from seed investors, in cases where the company doesn't yet have a formal valuation and doesn't yet have shares to issue to the investors. Basically, a SAFE is an agreement that the investor will pay money now and receive shares of company stock in the future. With a SAFT, the agreement is for tokens rather than company stock.

7.17 The SAFT was deliberately created to allow blockchain-based projects to

---

[125] https://melon-lee.gitbook.io/astrals/
[126] https://coinmarketcap.com/currencies/galaxy-dao/

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

avoid SEC registration requirements. For this to happen, upon launch, the tokens need to be utility tokens, meaning they can be used to operate on the network once it is functional. If the token provides users with utility, the thinking goes, then they cannot be considered securities. Thus, for a SAFT to pass regulatory muster, it must be an agreement for utility tokens and not for securities tokens.

7.18 The creators of the SAFT, Protocol Labs and Cooley, said that the SAFT itself is an investment contract that needs to be registered with the SEC or receive an exemption from registration requirements.[127]

7.19 The SAFT concept rests on shaky legal ground. In multiple crypto-related cases that pre-date the Astrals project, the SEC has asserted, and courts have agreed, that sales of contractual rights to acquire tokens on a when-issued basis should be integrated with later sales of the tokens from a securities law perspective.

7.20 On September 30, 2020, in *Securities and Exchange Commission v. Kik Interactive, Inc.* SDNY Judge Alvin Hellerstein ruled that Kik's pre-sale of its new digital asset, the Kin token, to private investors through SAFTs, coupled with the public distribution of this token following the private sale, qualified as a single public distribution and an unregistered security.

7.21 The Kik ruling came shortly after a similar ruling by the same court in S*EC v. Telegram Grp.*, 2020 WL 1430035 (SDNY Mar. 24, 2020). The court granted the SEC's motion for a preliminary injunction preventing blockchain developer Telegram Group and TON issuer (collectively, Telegram) from selling its new cryptocurrency "Grams" to an initial group of purchasers who later would resell them to others, in the absence of a registration statement. The court concluded that that SAFT structure could not be viewed as two isolated phases but rather should be viewed as a single integrated scheme to issue securities that will yield a profit.

7.22 The *Telegram* and *Kik* rulings sent a stark warning to cryptocurrency issuers that they are unlikely to be able to bypass securities regulations and requirements by relying on a two-stage SAFT structure. Astrals LLC ignored this warning.

7.23 The SAFT executed between Astrals LLC and Mr. Divecha entitled Mr. Divecha to certain units of the $GLXY token upon "network launch," which is defined in the SAFT as when a "a bona fide transaction or series of transactions, pursuant to which the Company will sell the Tokens to the general public in a publicized product launch." Mr. Divecha paid $25,000 in another cryptocurrency, USD Coin, for this right.

---

[127] SAFT-Project-Whitepaper.pdf (saftproject.com)

7.24 The first page of the agreement notes that "THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES."

7.25 The economic reality of the SAFT and $GLXY token closely resembles the Telegram and Kik projects, whereby the courts found that the respective Kin and Grams tokens would be investment contracts even after the underlying project becomes public.

7.26 As noted above, the Galaxy DAO would function like a digital venture capital fund. The $GLXY token, which is needed to participate in the DAO, is an unregistered investment contract. In other words, the $GLXY token is NOT a utility token. Thus, the SAFT executed between Astrals LLC and Mr. Divecha is further evidence that the $GLXY token is an unregistered investment contract.

123.   The Astrals Financial Products were therefore "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

## CLASS ACTION ALLEGATIONS

124.   As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.  **Class Definitions**

125.   Plaintiffs seek to represent the following Global Class and alternatively International and Nationwide Classes (collectively, the "Classes"):

(1) **Global Class:** All persons or entities who, since March 9, 2022, purchased or held legal title to and/or beneficial interest in any Astrals Financial Products.

(2) **International Class:** All persons or entities residing outside the United States who, since March 9, 2022, purchased or held legal title to and/or beneficial interest in any Astrals Financial Products.

**(3) Nationwide Class:** All persons or entities in the United States who, since March 9, 2022, purchased or held legal title to and/or beneficial interest in any Astrals Financial Products.

Excluded from the Classes are the Defendants and their officers, directors, affiliates, legal representatives, and employees; any governmental entities; any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

**B.  Numerosity**

126.    The Classes are comprised of thousands of consumers globally, nationwide, and throughout the state of Florida who were offered and/or sold Astrals Financial Products. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiff, but is easily identifiable through the Astrals Project's corporate records.

**C.  Commonality/Predominance**

127.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)  whether Defendants violated the Securities Act;

(b)  whether Astrals Financial Products constitute securities under federal law;

(a)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(b)  whether Plaintiffs and Class members are entitled to injunctive relief;

(c)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(d)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.  Typicality**

128.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

and all class members were offered and/or unregistered securities, and Plaintiffs are advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to Defendants that are unique to Plaintiffs.

### E.   **Adequacy of Representation**

129.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.   **Requirements of Fed. R. Civ. P. 23(b)(3)**

130.   The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct of the offer and sale of unregistered securities in the form of Astrals Financial Products .

131.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

132.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G.   **Superiority**

133.   A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;
>
> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

### H. <u>Requirements of Fed. R. Civ. P. 23(b)(2)</u>

134.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of offering and/or selling the Astrals Financial Products, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### I. <u>Requirements of Fed. R. Civ. P. 23(c)(4)</u>

135.    Because the predominant issue regarding Defendants' liability is whether the Astrals Financial Products offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify either or both of the Classes against Defendants for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J. <u>Nature of Notice to the Proposed Classes.</u>

136.    The names and addresses of all Class Members are contained in the business records maintained by the Astrals Project and are readily available to Defendants. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

<u>**COUNT ONE**</u>
**Offer and Sale of Unregistered Securities**
**in Violation of Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a)**
**(on behalf of Plaintiff and Members of the Classes)**

137.    Plaintiffs re-allege and incorporate paragraphs 1–136 above as if fully set forth herein and further allege as follows.

138.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants.

139.    Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), states:

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

140.    The Astrals Financial Products are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) because are "notes" and/or "investment contracts."

141.    The Astrals Financial Products were not registered with the SEC. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

142.    Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

143.    Defendants sold and offered to sell the unregistered Astrals Financial Products to Plaintiffs and Class members, in violation of 15 U.S.C. §§ 77e(a).

144.    Plaintiffs and members of the Classes suffered damages as a result of their purchase of the unregistered Astrals Financial Products securities through the Magic Eden marketplace.

145.    By reason of the foregoing, Defendants violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

146.    As a result of Defendants' unregistered sale of the Astrals Financial Products securities, Defendants are liable to Plaintiff and the members of the Classes. 15 U.S.C. § 77l(a).

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

## COUNT TWO

### Violation of Section 15 of the Securities Act

### (on behalf of Plaintiff and Members of the Classes)

147.   Plaintiffs re-allege and incorporate paragraphs 1–125 above as if fully set forth herein and further allege as follows.

148.   Plaintiff bring this claim individually and on behalf of the members of the Classes against Defendants.

149.   This Count is asserted against Defendants under Section 15 of the Securities Act, 15 U.S.C. §77o.

150.   Defendants, by virtue of their office, stock ownership, agency, agreements or understandings, and specific acts was, at the time of the wrongs alleged herein, and as set forth herein, a controlling person within the meaning of Section 15 of the Securities Act. Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of Astrals Financial Products securities as described herein.

151.   Defendants possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the Astrals Project through ownership of voting securities, by contract, subscription agreement, or otherwise.

152.   Defendants had sufficient influence to have caused the Astrals Project to submit a registration statement.

153.   Defendants jointly participated in, and/or aided and abetted, the Astrals Project's failure to register the Astrals Financial Products securities.

154.   Defendants knew of or had reasonable grounds to believe in the existence of the facts underlying Defendants' and the Astrals Project's liability for violating Section 12(a) of the Securities Act, 15 U.S.C. §77l(a).

155.   By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and is liable to Plaintiff and the Classes for rescission and/or damages suffered.

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

      a.  Certifying the Classes as requested herein;

      b.  Awarding actual, direct and compensatory damages;

      c.  Awarding restitution and disgorgement of revenues if warranted;

      d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendant's practices as set forth herein to be unlawful;

      e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendant, with Court supervision, to identify the victims of their conduct and pay them all money they are required to pay;

      f.  Awarding attorneys' fees and costs; and

      g.  Providing such further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: September 7, 2023                    Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
John E. Rodstrom, III
Florida Bar No. 1003112
**THE MOSKOWITZ LAW FIRM, PLLC**
3250 Mary Street, Suite 202
Coconut Grove, FL 33133
Telephone: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
john@moskowitz-law.com

By: */s/Jose M. Ferrer*
Jose Ferrer
Florida Bar No. 173746
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com

*Co-Counsel for Lead Plaintiffs and the Class*

*Harper v. O'Neal*
*Amended Class Action Complaint and Demand for Jury Trial*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed September 7, 2023, via the CM/ECF system, which will send notification of such filing to all attorneys of record.

By: *<u>/s/ Adam M. Moskowitz</u>*
ADAM M. MOSKOWITZ
Florida Bar No. 984280